Casey, C. J.,
delivered the opinion of the Court.
The claimant prosecutes this suit to establish his right to a warrant for one hundred and sixty acres of land, under the provisions of the act approved 3d of March, 1855, and the supplement thereto passed the 14th of May, 1856. The evidence shows that in January, 1855, an Indian disturbance, or outbreak commenced in the Territory of New Mexico, in which a portion of the Utah and Apache tribes were implicated. General Garland, of the United States army, was in command of the military department in which New Mexico was embraced. He deemed the disturbance of a character to require a greater force to quell than he had at command, and he made a requisition upon the governor of the Territory to furnish him with six companies of volunteers to aid in quelling the rebellion and chastising the Indians into submission. Among the citizens who volunteered was the claimant. He joined Captain W. S. Cunningham’s company of mounted scouts, and participated in ahattle against the Indians near Hita, New Mexico, on the 18th of May, 1855.
The claim for a warrant was denied plaintiff at the Pension bureau, on the ground that the services rendered were subsequent to the *234 passage of the act of 3d of March, 1855, and therefore not within the purview of that statute, or the amendatory act passed 14th of May, 1S5G; and the decision of the Commissioner was sustained by the Secretary of the Interior, on appeal.
A great variety of questions was raised as to the power and jurisdiction of this court Those were disposed of in the opinion delivered in the case of The City of Carondelet v. The United States, at the last term, on the question of jurisdiction. The only one omitted to he answered was the one specially applicable to this case, that we cannot act as an appellate tribunal to review the proceedings of an executive department.
This ease is not an appeal. It is an original claim prosecuted in this court, where all the proceedings are de novo. The act constituting this court confers original jurisdiction “ to hear and determine all- claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States, which may be suggested to it by a petition filed therein.” The claim is founded upon a law of Congress, and as such is within the letter and intention of the law. Nor is the objection valid that the Pension bureau has been constituted a special tribunal for the adjudication of these cases, and that the decision of the Commissioner is final, being subject only to appeal to the Secretary of the Interior. We know of no law that gives a judicial, or even quasi judicial, charcter to the action of the executive departments, unless under some special law. In cases of money claims it has not been considered as ousting or affecting our jurisdiction that the accounting officers, or even the head of a department, has decided that the claimant was not entitled to be paid. Indeed, our rules require, in every such case, that the claimant shall aver that he presented his claim to the proper department, and that it was disallowed. Yet there is as much reason for holding the one final and conclusive as the other. Their acts are not judicial in their character, but are binding on other executive officers, but not on the courts.
It is objected also that the claimant cannot recover, because the Indian troubles in which he served was not a “war” in the sense used in the acts of 1855 and 185G. War is defined to bo that state in which wo prosecute our rights by force. We shall not go into any elaborate or critical examination of what constitutes a war, but content ourselves with trying to ascertain the sense in which the legislature used that term in the acts now under consideration. The act of the 2Stb of September, 1850, (9 Stat., 520,) appears to be the first of the *235 series oí' general acls on the subject of bounty lands, and gives certain amounts of lands to those who performed military service in any regiment, company, or detachment in the service of the United States in the war with Great Britain declared on the 18th of June, 1812, or in any of the Indian wars since 1790, and to each of the commissioned officers who were engaged in the military service of the United States in the late war with Mexico.
The 4th section of the act of 22d of March, 1852, 10 Stat„ 4, enacted that, “in all cases where the militia or volunteers, or State troops of any State or Territory, were called into military service, and whose services have been paid by the United States, subsequent to the 18th of June, 1812, the officers and soldiers of such militia, volunteers, or troops shall be entitled to all the benefits of the act ” of September 28, 1850.
The 5th section of the same act provided that in computing the length of such service one day should be allowed for every twenty miles from the place where the company, battalion, or regiment was organized to the place where they were mustered into the service of the United States, and also a like period for every twenty miles from the place where it was discharged to the place where it was organized, and from whence it marched to enter the service. The next in order of this series is the act of March 3, 1855, (§ 1, 10 Stat., 701,) which provides:
“That each of the surviving commissioned and non-commissioned officers, musicians, and privates, whether of regulars, volunteers, rangers, or militia, who were regularly mustered into the service of the United States, and every officer, commissioned or non-commissioned, seaman, ordinary seaman, flotilla-man, marine, clerk, and landsman in the navy, in any of the wars in which this country has been engaged since seventeen hundred and ninety, and each of the survivors of the militia, or volunteers, or State troops of any State or Territory, called into military service, and regularly mustered therein, and whose services have been paid by the United States, shall be entitled to receive a certificate or warrant from the Department of the Interior for one hundred and sixty acres of land; and where any of those who have been so mustered into service and paid shall have received a certificate or warrant, he shall be entitled to a certificate or warrant for such quantity of land as will make, in the whole, with what he may have heretofore received, one hundred and sixty acres to each such person having served as aforesoid : Provided, The person so having *236 been in service shall not receive said land warrant if it shall appear by the muster-rolls of his regiment or corps that he deserted or was dishonorably discharged.”
By the act of 14th May, 1856, (§ 5, 11 Stat., 8,) amendatory of the act of 3d March, 1855, it was enacted “ that the provisions of the said act shall extend to all persons who have served as volunteers with the armed forces of the United States, subject to military orders, for the space of fourteen days, in any of the wars specified in the first section of the said act, whether such persons were or were not mustered into the service of the United States.”
This same act, in the 7th section, enacts that “ in computing the period of service one day shall be allowed for every twenty miles from the place where the company, battalion, or regiment was formed to the place where it was mustered into the service, and also one day for each twenty miles from the place whore it was discharged to the place where it was organized: Provided, That such march was in obedience to orders from the President of the United States or some general officer of the United States commanding an army or department, or the chief executive officer of the State or Territory by which such company, battalion, or regiment was called into service.” On the 31st day of January, 1855, Brigadier General John Garland, commanding the department of New Mexico, reported to the general-in-chief the commencement of massacres and hostilities by the Mezcalero Apaches, and the means he had taken to suppress their depredations, in which report, after recounting the depredations of the Indians, he states : “ These causes, with other evidences of hostility round about us here, induced me reluctantly, but of necessity, to call upon the governor of this Territory for five companies of mounted volunteers, to serve six months, unless sooner discharged. The volunteers have promptly responded to the call, and the last of the companies have been this day mustered into the service. It is very desirable that an appropriation should be made by the present Congress to meet this call. There is great uneasiness and insecurity among all the frontier settlers; and in ordc-r to inspire confidence I have determined to place in the field a force of about four hundred regulars and volunteers, with orders to carry the war into the Utah country, and force upon them, the necessity of looking after their own security and that of their women and children.” On the 31st of May, 1855, the same general reports that “in order to put a proper force in the field to punish the Apaches of the White and Sacramento mountains, I was forced to call into service *237 a sixth company of volunteers. The mustering of .this company, I believe, was, in the hurry of business, omitted to be reported at the proper time.”
The reports of the general in command of this department continued from the 31st of January, 1855, up till the 31st July in the same year, in which he recounts the military operations against the tribes, and transmits the reports of his subordinate officers in command of detachments or expeditions against the savages. These reports were transmitted to the general-in-chief, and by him submitted, with his approval, to the Secretary of War, and, with the report of the Secretary of War, transmitted to and laid before Congress by the President of the United States at the commencement of the session of 1S55-’5G. (See Mes-sag'e and Docs., 1855-’56, part 2, p. 56 to 72.)
In the report of the Secretary of War, (ibid., p. 4,) he says: “In the departments of the West, Texas, New Mexico, and the Pacific, Indian hostilities have been of frequent occurrence.”
On pago 5 he says again: “In the departments of Texas, New Mexico, and the Pacific military expeditions have been sent against the Indians guilty of outrages upon the persons and property of the frontier inhabitants and emigrants within those sections of country, and in several cases summary punishment has been inflicted by the troops on the offending tribes. The details of these operations will be found in the papers accompanying this report.” Again, on same page, he says : “ From a recent report of the commanding general of the department of New Mexico, it appears that all the Indian tribes within his command have concluded treaties with the governor, and retired to the limits assigned them. Service in Indian campaigns, though little calculated to excite the military ardor of the soldier, is attended by equal hazard, and even by greater privation, than belongs to warfare with a civilized foe. The gallantry, zeal, and devotion of both officers and men have been repeatedly, within the last year, put to the severest test, and they have on all such occasions equalled the anticipations which past conduct warranted, and have renewed their claim to the gratitude of those whose flag they bear and in whose service they have suffered.” He also states that the appropriations, owing to the extensive movements of troops in the States of Texas and California, and the Territories of New Mexico, Oregon, Washington, Kansas, and Nebraska, on account of the disturbed state of the Indians, will fall short of the wants of the service, and will reqifire large .appropriations for deficiencies.
*238 I have thus recounted the military operations against these Indians, with the action of the various departments of the government recognizing a state of hostility between these tribes and the government of the United States; and though there may have been no formal declaration of war by Congress, nor any public official proclamation of its existence by the President of the United States, yet it can scarcely bo doubted, from the official acts and recognitions by the President and by Congress of the existing hostility by these tribes, and the means taken to suppress the disturbance and chastise them into submission, there existed that condition of things between the government of the United States and those tribes known, in common parlance as well as legal enactments, as an “Indian war.” In our intercourse and dealings with these savage tribes, regarded in our law as independent and domestic nations, we do-not apply the same rules of peace or war that regulates the intercourse and fixes the relations between us and foreign independent nations. Though wc have had many “Indian wars,” it has been hut rarely that Congress, in which the Constitution vests the right to declare war and make peace, has enacted or resolved a formal declaration of hostilities against any tribe or tribes. It has been regarded as sufficient that they have by law provided for the protection of our frontier against the attacks of these tribes, and for calling out volunteers to aid the army, leaving the executive department to act according to the emergencies as they arise. And Congress has seldom failed to recognize and ratify such acts, by voting appropriations to pay the troops called out and defray the expenses incident to such expeditions. This case has been no exception to the general rule. And taking- into view the actual condition of things in the Territory of New Mexico between the first of January, 1855, and the first of August of the same year, with the acts of this government during that period and subsequently, we cannot say that this was not an “ Indian.war.” There were repeated acts of depredation by the Indians upon the property of the white settlers, many acts of cruelty, murder, and massacre, such as are incident to savage warfare. These were repelled and punished by the forces of the United States under a general officer in command of the department. Volunteers in aid of these forces were called out upon requisitions made upon the civil governor of the Territory, and these were duly organized and mustered into the service of the United States. Expeditions were planned against these Indians, their couutry invaded, and battles fought against them, and finally a treaty of peace concluded with them.
*239 And on the 3d of March, 1857, Congress made an appropriation in the following words: “ That there be appropriated for pay, subsistence, and commuted allowance of six companies of volunteers, called into the service of the United States in New Mexico in the year eighteen hundred and fifty-five, one hundred and fifteen thousand dollars, and for forage, transportation, camp and garrison equipage, and incidental expenses of said troops while in service, seventy-two thousand five hundred dollars.”
The President, in his annual message of lS56-’57, says: “ The army during the past year has been so constantly employed against hostile Indians that it can scarcely be said to have a peace establishment.” These facts of recognition, during the progress of these hostilities and subsequently, all go to show that both Congress and the Executive recognized the necessity and propriety of the calling out of these troops, and regarded the then existing state of things as constituting what has long been known as an “ Indian war.”
The final objection made is that the service, having been rendered subsequent to the 3d of March, IS55, is not embraced within its provisions, or those of the amendatory act of the 14th of May, 1856.
1st. Because the expression in the act of 1855, “ any. of the wars in which the country has been engaged since 1790,” did not include such wars as were then in progress and not completed. 2d. Because if the war then in progress was included in the act of 1855, the terms in § 5 of the act of 1856, “ all persons who have served with the armed forces of the United States in any of the wars specified” in the act of 3d of March, 1855, would only refer to such service as was rendered before the passage of the act of 1855.
The terms “has been engaged since 1790,” we think, according to their plain and obvious meaning, would embrace such troops as had theretofore been mustered into the service in a war then pending, and had served the requisite time prior to the passage of the act. The words “has "been engaged,” bring the period down to the date of the enactment itself — that is, they refer to the whole period between 1790 and the 3d of March, 1855; and service for fourteen days in any war within those dates would be within the plain words, and, as we think, within the intent of the enactment. The act is clearly retrospective as to service, but it would be a slrained construction to say that it should be so also in regard to the close of the war in which the service was'rendered. We are, therefore, of opinion that proof of the requisite period of service prior to the 3d of March, 1855, would entitle the *240 party to the benefits of the act of that date, although the war in which 'it was rendered was not ended until after its passage.
The second point, as to whether the act of 14th of May, 1856, extends the benefits of the act of 1855 beyond the date of that act, or to the intermediate period between the two acts, is a question of more difficulty. The fifth section of this act provides “ that the provisions of the said act (3d of March, 1855,) ‘shall extend to all persons who have served as volunteers with the armed forces of the United States, subject to military orders, for the space of fourteen days, in any of the wars specified in the first section of the said act, whether such persons were or were not mustered into the service of the United States.’ ” It is contended that this section made no other change in the provisions of the act of 1855 than to extend its benefits to persons who had not been mustered into the United States service. And that to entitle any one fo the benefits of its provisions, his right to the warrant must have been perfect at the date of the former act, with the exception that he need not have been mustered into the service of the United States, but that the war must have been one in which the country was previously engaged, and the service have been rendered before its date.
We need not determine whether a person who rendered service in a war which commenced after the date of the act of 1855 is within the purview of the act of 1856 or not, for we have already decided that a service, in a war pending at the date of the act of 1855, complete before its passage, entitled the person rendering it to participate in the bounty it confers. The precise question now is, does a service in the prosecution of the same war, subsequent to the act of 1855 and prior to the act of 1856, entitle such person to the land warrant? In construing these acts it is of importance to keep in view the objects and purposes-of Congress in their enactment. And in considering these we cannot fail to observe the liberal spirit manifested in the more recent legislation on this subject, and the enlarged policy by which it was dictated, the purpose of which, as appears to us, was to impress the public with the idea that the nation was not unmindful of those who perilled their lives in the conflicts in which it had been engaged; to confer the wild lands of the government upon those who had the will and ability to defend the country; and to hold out to the men of the country, whose services might be needed in any subsequent emergency, the encouragement that the same liberal policy would suitably recognize and reward their patriotism and valor.
The act of 1855 itself is not an original act, hut a supplement or addition to the bounty-land laws then in force, as the title indicates. The *241 act of 2Sth September, 1850, (9 St-at., 520,) gives bounty land to “persons who performed military service, &c., in any of the Indian wars since 1790;” the supplement of 1855 says, “in any of the wars in which this country has been engaged since 1790;” the act of 1856, “in any of the wars specified in the first section of said act,” 3d March, 1855.
Now every one will admit that it would be a narrow and illiberal construction of these acts to hold that it is only such persons as served in wars that occurred between 1790 and the date of the original act, 28th September, 1850, that are embraced in the first section of the act of 1S55. No one, so far as we know, has contended for such a restricted application of its provisions, but all admit that it applies to service in wars between 1790 and 3d March, 1855. The act of 1856 is amendatory of and supplementary to the act of 1855. The object of this latter statute was to extend and enlarge, not to abridge or restrict, the benefits conferred by the act to which it is a supplement. Its plain purpose is to extend the benefit of the bounty-land law to several classes of persons who were not embraced in the former acts, or were excluded by its terms. This being so, we feel constrained to adopt that construction which shall give effect to the liberality and beneficence of Congress, not inconsistent with the terms they have used in the law itself. The act under consideration says, “ that the provisions of the act (1855) shall extend to all persons who have served with the armed forces of the United States, subject to military duty, for the space of fourteen days, in any of the wars specified in the first section of the said act, whether such persons were or were not mustered into the service of the United States.” This is not merely a legislative construction of the terms of the former law, but an extension of its benefits to persons not embraced in its provisions. Why does not this extension apply as well to the time of service as to the beneficiaries themselves ? Does the phrase “ to all persons who have served as volunteers” refer to the date of the act in which it is used, or to the date of the prior act? Its literal sense, as well as grammatical construction, is to indicate any person who has served prior to the time at which the words are used. If Congress intended that the period of service should be anterior to the act of 1855, it appears to us they would have used a different tense, as “ to all persons who had served,” &c. But it is said a contrary construction is indicated in the latter part of the section, where it is provided that this service *242 shall have been “in any of the wars specified in the first section of (he act of 1855.”
Mr. J. S. Watts for the claimant.
Mr. Bingham, the Solicitor, and Mr. J. J. Weed, the Assistant Soilictor, for the government.
We have already shown, in a former part of this opinion, that the war in which this service was rendered was embraced in the act of 1855. The service was rendered after the date of that act, and before that of 1856, and we think such services are embraced within the terms employed in the latter law. We feel the less hesitation in coming to that conclusion when we regard the reason and spirit of the law, the purpose and policy of the enactment, and the' liberal views manifested by Congress on this subject. Believing that we best carry out their intention and meaning by giving a liberal and beneficial exposition to this amendatory and remedial statute, we, therefore, are of opinion that the services rendered by the claimant in this case are embraced in the provisions of this act of 1856; and we have also examined the proofs submitted, and hold that he is entitled to the relief prayed for, and accordingly direct the following decree to he entered in this case.
This cause having been heretofore heard and considered by the court, it is now further considered, adjudged, and decreed by the said court, before the judges thereof now hero, that the said Julian Alire, the claimant, is entitled to have and recover of and from the United States one military bounty land warrant for one hundred and sixty acres of land for service rendered by him, the said Julian Alire, as a volunteer in the military service of the United States in an Indian war in the year 1856; and the said warrant is by the court now hero adjudged and decreed to him, the said Julian Alire; and it is also further adjudged and decreed by the same court that the said military bounty land warrant be made, issued, and delivered to tbe said Julian Alire by the proper officer. It is further ordered that this decree be certified by the clerk of the Court of Claims, under the seal thereof, and remitted to the Secretary of the Interior.
Judge Boring dissented.