Mr. Chief Justice Chase
delivered the opinion of the court:
The general question in this case is whether or not the proviso relating to suits for the proceeds of abandoned and captured property in the Court of Claims, contained in the appropriation act of July 12,1870, debars the defendant in error from recovering, as administrator of Victor F. Wilson, deceased, the proceeds of certain cotton belonging to the decedent, which came into possession of the agents of the Treasury Department as captured or abandoned property, and the proceeds of which were paid by them according to law into the Treasury of the United States.
The answer to this question requires a consideration of the rights of property, as affected by the late civil war, in the hands of citizens engaged in hostilities against the United States.
It may be said in general terms that property in the insurgent States maybe distributed into four classes: (1.) That which belonged to the hostile organizations or was employed in actual hostilities on land. (2.) That which at sea became lawful subject of capture and prize. (8.) That which became subject of confiscation. (4.) A peculiar description, known only in the recent war, called captured and abandoned property.
The first of these descriptions of property, like property of other like kind in ordinary international wars, became, wherever taken, ipso facto the property of the United States. — (Halleck’s International Law.)
The second of these descriptions comprehends ships and vessels with their cargoes belonging to tkainsurgents or employed in aid of them; but property in these was not changed by capture alone but by regular judicial proceeding and sentence.
Accordingly it was provided in the Abandoned or Captured Property Act of March, 12, 1863, (12 Stat. L., p. 820,) that the property to be collected under it !i shall not include any kind or description used or intended to be used for carrying on war against the United States, such as arms, ordnance, ships, steam *243 boats and their furniture, forage, military supplies, or munitions of war.”
Almost all the property of the people in the insurgent States was included in the third description, for after sixty days from the date of the President’s proclamation of July 25,1862, (12 Stat. 1. p. 1266,) all the estates and property of those who did not cease to aid, countenance, and abet the rebellion became liable to seizure and confiscation, and it was made the duty of the President to cause the same to be seized and applied, either specifically or in the proceeds 'thereof, to the support of the Army, (12 Stat. L., p. 590.) But it is to be observed that tribunals and proceedings were provided, by which alone such property could be condemned, and without which it remained unaffected in the possession of the proprietors.
It is thus seen that, except to property used in actual hostilities, as mentioned in the first section of the act of March 12, 1863, no titles were divested in the insurgent States, unless in pursuance of a judgment rendered after due legal proceedings. The Government recognized to the fullest extent the humane maxims of the modern law of nations, which exempt private property of non-combatant enemies from capture as booty of war. Even the law of confiscation was sparingly applied. The cases were few, indeed, in which the property of any not engaged in actual hostilities was subjected to seizure and sale.
The spirit which animated the Government received special illustration from the act under which the present case arose. We have called the property taken into the custody of public officers under that act a peculiar species, and it was so. There is, so far as we are aware, no similar legislation mentioned in history.
The act directs the officers of the Treasury Department to take into their possession and make sale of all property abandoned by its owners or captured by the national forces, and to pay the proceeds into the national Treasury.
That it was not the intention of Congress that the title to these proceeds should be divested absolutely out of the original owners of the property seems clear upon a comparison of different parts of the act.
We have already seen that those articles which became by the simple fact of capture the property of the capitor, as ordnance, munitions of war, and the like, or in which third parties *244 acquired rights which might be made absolute by decree, as ships and other vessels captured as prize, were expressly excepted from the operation of the act; and it is reasonable to infer that it was the purpose of Congress that the 2proceeds of the property for which the special provision of the act was made should go into the Treasury without change of ownership). Certainly such was the intention in respect to the'property of loyal men. That the same intention prevailed in regard to the projierty of owners who, though then hostile, might subsequently become loyal, appears probable from the circumstance that no jxrovision is anywhere made for confiscation of it while there is 110 trace in the statute-book of intention to divest ownership of private property not excepted from the eifect of this act, otherwise than by 2>roceediugs for confiscation.
In the case of Padelford we held that the right to the possession of private property was not changed until actual seizure by proper military authority, and that actual seizure by such authority did not divest the title under the provisions of the Abandoned or Captured Property Act. The reasons assigned, seem fully to warrant the conclusion. The Government constituted itself the trustee for those who were by that act declared entitled to the proceeds of captured and abandoned property, and for those whom it should thereafter recognize as entitled. By the act itself it was provided that any person claiming to have been the owner of such property might jirefer his claim to the proceeds thereof, and, on imoof that he had never given aid or comfort to the rebellion, receive the amount after deducting expenses.
This language makes the right to the remedy dependent upon proof of loyalty, but impfiies that there may he proof of ownership without proof of loyalty. The property of the original owner is in no case absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of the property have passed into the possession of the Government, aud restoration of the property is pledged to uone except to those who have continually adhered to the Government. Whether restoration will be made to others, or confiscation will be enforced, is left to be determined by considerations of public policy subsequently to be developed.
It is to be observed, however, that the Abandoned or Captured Property Act was approved on the 12th of March, 18C3, *245 and on. the 17th of July, 1802, Congress bad already passed an act — -the same which provided for confiscation — which authorized the President. “ at any time hereafter, by proclamation, to extend to persons who may have participated in the existing rebellion, in any State or part thereof, pardon and amnesty, with such exceptions and at such time aiid on such conditions as he may deem expedient for the public welfare.” The act of the 12th of March 1803, provided for the sale of enemies’ property collected under the act, and payment of the proceeds into the Treasury, and left them there subject to such action as the President might take under the act of the 11th of July, 1862. What was this action ?
The suggestion of pardon by Congress, for such it was, rather than authority, remained unacted on for.more than a year. At length, however, on the 8th of December, 1803, (12 Stat. L., 737,) the President issued a proclamation, in which he referred to that act, and offered a full pardon, with restoration of all rights of property,' except as to slaves and property in which rights of third persons had intervened, to all, with some exceptions, who, having been engaged in the rebellion as actual participants, or as aiders or abettors, would take and keep inviolate a prescribed oath. By this oath the person seeking to avail himself of the offered pardon was required to promise that he would thenceforth support the Constitution of the United States and the union of the States thereunder, and would also abide by and support all acts of Congress and all proclamations of the President in reference to slaves, unless the same should be modified or rendered void by the decision of this court.
In his annual message, transmitted to Congress on the samé day, the President said “ the Constitution authorizes the Executive to grant or withhold pardon at his own absolute discretion.” He asserted his power “to grant it on terms as fully established,” and explained the reasons which induced him to require, applicants for pardon and restoration of property to take the oath prescribed, in these words: “ Laws and proclamations were enacted and put forth for the purpose of aiding in the suppression of the rebellion. To give them the fullest effect there had to be a pledge for their maintenance. In my judgment they have aided, and will further aid, the cause for which they were intended. To now abandon them would not *246 only be to relinquish a lever of power, but would also be a cruel and astounding breach of faith. * * * For these and other reasons it is thought best that support of these measures shall be included in the oath, and it is believed the Executive may lawfully claim it in return for pardon and restoration of forfeited rights, which he has clear constitutional power to withhold altogether or grant upon the terms which he shall deem wisest for the public interest.”
The proclamation of pardon, by a qualifying proclamation issued on the 2Gth of March, 1804, (13 Stat. L., 741,) was limited to those persons only who, being yet at large and free from confinement or duress, shall voluntarily come forward and t ake the said oath with the purpose of restoring peace and establishing the national authority.”
On the 29th of May, 1805, (13 Stat. L., 758,) amnesty and pardon, with the restoration of the rights of property except as to slaves, and that as to which legal proceedings had been instituted under laws of the United States, were again offered to all who had, directly or indirectly, participated in the rebellion, except certain persons included in fourteeii classes. All who embraced this offer were required to take and subscribe an oath of like tenor with that required by the first proclamation.
On the 7th of September, 1807, (15 Stat. L., 099,) still another proclamation was issued, offering pardon and amnesty, with restoration of property, as before and on the same oath, to all but three excepted classes.
And finally, on the 4th of July, 1808, (15 Stat. L., 702,) a full pardon and amnesty was granted, with some exceptions, and on the 25th of December, 1808, (15 Stat. L., 711,) without exception, unconditionally and without reservation, to all who had participated in the rebellion, with restoration of rights of property as before. No oath was required.
It is true that the section of the act of Congress which purported to authorize the proclamation of pardon and amnesty by the President was repealed on the 21st of January, 1807; but this was after the close of the war, when the act had ceased to be important as an expression of the legislative disposition to carry into effect the clemency of the Executive, and after the decision of this court that the President’s power of pardon ■“ is not subject to legislationthat “ Congress can neither *247 limit the effect of bis pardon, nor exclude from its exercise any class of offenders,” (14th January, 1867.) It is not important, therefore, to refer to this repealing act further than to say that it is impossible to believe, while the repealed provision was in full force, and the faith of the legislature as well as the Executive was engaged to the restoration of the rights of property promised by the latter, that the proceeds of property of persons pardoned, which had been paid into the Treasury, were to be withheld from them. The repeal of the section in no respect changes the national obligation, for it does not alter at all the operation of the pardon, or reduce in any degree the obligations of Congress under the Constitution to give full effect to it, if necessary, by legislation.
We conclude, therefore, that the title to the proceeds of the ' property which came to the possession of the Government by capture or abandonment, with the exceptions already noticed, was in no case divested out of the original owner. It was for the Government itself to determine whether these proceeds should be restored to the owner or not. The promise of the restoration of all rights of property decides that question affirmatively as to all persons who availed themselves of the proffered pardon. It was competent for the President to annex to his offer of pardon any conditions or qualifications he should see fit; but after those conditions and qualifications had been satisfied, the pardon and its connected promises took full effect. The restoration of the proceeds became the absolute right of the persons pardoned, on application within two years from the close of the war. It was, in fact, promised for an equivalent. “ Pardon and restoration of political rights” were “ in return n for the oath and its fulfilment. To refuse it would be a breach of faith not less “ cruel and astounding” than to abandon the freed people whom the Executive had promised to maintain in their freedom.
What, then, was the effect of the provision of the act of 1870, (16 Staff L., 335,) upon the right of the owner of the cotton in this case1? He had done certain acts which this court (United States v. Padelford, 9 Wall., 531) has adjudged to he acts in aid of the rebellion; but he abandoned the cotton to the agent of the Treasury Department, by whom it has been sold and the proceeds paid into the Treasury of the United States; and he took, and has not violated, the amnesty oath under the *248 President’s proclamation. TJpon this case the Court of Claims pronounced him entitled to a judgment for tbe net proceeds in tbe Treasury. Tliis decree was rendered on tbe 26th of May, 1869; the appeal to this court made on tbe 3d of June, and was tiled here on tbe lltli of December, 1869.
The judgment of tbe court in tbe case of Padelford, which, in its essential features, was the same with this case, was rendered on the 30th of April, 1870. It affirmed the judgment of the Court of Claims in his favor.
Soon afterward the provision in question was introduced as a proviso to the clause in the'general appropriation bill appropriating a sum of money for the payment of judgments of the Court of Claims, and became a part of the act, with perhaps little consideration in either House of Congress.
This proviso declares in substance that no pardon, acceptance, oath, or other act performed in pursuance, or as a condition of pardon, shall be admissible in evidence in support of any claim against the United States in the Court of Claims, or to establish the right of any claimant to bring suit in that court; nor, if already put in evidence, shall be used or considered on behalf of the claimant, by said court, or by the appellate court on appeal. Proof of loyalty is required to be made according to the provisions of certain statutes, irrespective of the effect of any Executive proclamation, pardon, or amnesty, or act of oblivion; and when judgment has been already rendered on other proof of loyalty, the Supreme Court, on appeal, shall have no further jurisdiction of the cause, and shall dismiss the same for want of jurisdiction. It is further provided that whenever any pardon, granted to any suitor in the Court of Claims, for the proceeds of captured and abandoned property, shall recite in substance that the person pardoned took part in the late rebellion, or was guilty of any act of rebellion or disloyalty, and shall have been accepted in writing without express disclaimer and protestation against the fact so recited, such pardon or acceptance shall be taken as conclusive evidence in the Court of Claims, and on appeal, that the claimant did give aid to the rebellion; and on proof of such pardon, or acceptance, which proof may be made summarily on motion or otherwise, the jurisdiction of the court shall cease and the suit shall be forthwith dismissed.
The substance of this enactment is that an acceptance of a *249 pardon, without disclaimer, shall be conclusive evidence of the acts pardoned, but shall be null and void as evidence of the rights conferred by it, both in the Court of Claims and in this court on appeal.
It was urged in argument that the right to sue the Government in the Court of Claims is a matter of favor; but this seems not entirely accurate. It is as much the duty of the Government as of individuals to fulfill its obligations. Before the establishment of the Court of Claims claimants could only be heard by Congress. That court was established in 1855, (10 Stat. L., 612,) for the triple purpose of relieving Congress, and of protecting the Government by regular investigation,, and of benefiting the claimants by affording them a certain mode of examining and adjudicating ujion their claims. It was required to hear and determine upon claims founded upon any law of Congress, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the Government of the United States. — (10 Stat. L.,s612.) Originally it was a court merely in name, for its power extended only to the preparation of bills to be submitted to Congress.
In 1863, the number of judges was increased from three to five, its jurisdiction was enlarged, and instead of being required to prepare bills for Congress, it was authorized to render final judgment, subject to appeal to this court and to an estimate by the Secretary of the Treasury of the amount required to pay each claimant. — (12 Stat. Li, 763.) This court being of opinion,. (2 Wall., 561,) that the provision for an estimate was inconsistent with the finality essential to judicial decisions, Congress, repealed that provision. — {13 Stat. L., 9.) Since then the Court of Claims has exercised all the functions of a court, and this-court has taken full jurisdiction on appeal. — (14 Stat. L., 44, 391,. 444.)
The Court of Claims is thus constituted one of those inferior courts which Congress authorizes, and has jurisdiction of contracts between the Government and the citizen, from which appeal regularly lies to this court.
Undoubtedly the legislature has complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decisions. And if this act did nothing more, it -would be our duty to give it effect. If it simply denied the right of appeal in a particular class of cases,, *250 there could be no doubt that it must be regarded as an exercise of the power of Congress to make “such exceptions from the appellate jurisdiction” as should seem to it expedient.
But the language of the proviso shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. Its great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have. The proviso declares that pardons shall not be considered by this court on appeal. We had already decided that it was our duty to consider them and give them effect, in cases like the present, as equivalent to proof of loyalty. It provides that whenever it shall appear that any judgment of the Court of Claims shall have been founded on such pardons, without other proof of loyalty, the Supreme Court shall have no further jurisdiction of the case, and shall dismiss the same for want of jurisdiction. The proviso further declares that every pardon granted to any suitor in the Court of Claims, and reciting that the person pardoned has been guilty of any act of rebellion or disloyalty, shall, if accepted in writing without disclaimer; of the fact recited, be taken as conclusive evidence in that court and on appeal of the act recited; and on proof of pardon or acceptance, summarily made on motion or otherwise, the jurisdiction of the court shall cease and the suit shall be forthwith dismissed.
It is evident from this statement that the denial of jurisdiction to this court, as well as the Court of 'Claims, is founded solely ■on the application of a rule of decision, in causes pending, prescribed by Congress. The court has jurisdiction of the cause to a given point; but when it ascertains that a certain state of things exists, its jurisdiction is to cease, and it is required to dismiss the cause for want of jurisdiction.
It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power.
The court is required to ascertain the existence of certain facts, and thereupon to declare that its jurisdiction on appeal has ceased by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way ? In the .case before us, the Court of Claims has rendered judgment for the claimant and an appeal has been taken to this court. We are directed to dismiss the appeal, if we find that the judgment *251 must be affirmed because of a pardon granted to the intestate of tlie claimants. Can we do so without allowing' one party to the controversy to decide it in its own favor'? Can wo do so without allowing that the legislature may prescribe rules of decision to the judicial department of the Government in cahes pending before it?
We think not; and thus thinking, we do not at all question what was decided in the case of Pennsylvania v. Wheeling Bridge Company. (18 How., 429.) In that case, after a decree in this court that the bridge, in the then state of the law, was a nuisance and must be abated as such, Congress passed an act legalizing the structure and making it a post-road; and the court, on a motion for process to enforce the decree, held that the bridge had ceased to be a nuisance by the exercise of the constitutional powers of Congress, and denied the motion. No arbitrary rule of decision was prescribed in that case, but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us no new circumstances have been created by legislation. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and give it an effect precisely contrary.
We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power.
It is of vital importance that these powers be kept distinct. The Constitution provides-that the judicial power of the United States shall be vested in one Supreme Court and such inferior courts as the Congress shall from time to time ordain and establish. The same instrument, in the last clause of the same article, provides that in all cases other than those of original jurisdiction, “ the Supreme Court shall have appellate jurisdiction both as to law and fact, with such exceptions and under such regulations as the Congress shall make.”
Congress has already provided that the Supreme Court shall have jurisdiction of the judgments of the Court of Claims on appeal. Can it prescribe a rule in conformity with which the court must deny to itself the jurisdiction thus conferred, because and only because its decision, in accordance with settled law, must be adverse to the Government and favorable to the suitor ? This question seems to us to answer itself.
The rule prescribed is also liable to just exception as impair- *252 hug the effect of a pardon, and thus infringing the constitutional power of the Executive.
It is the intention of the Constitution that each of the great-co-ordinate departments of the Government, the Legislative, the Executive, and the Judicial, shall be, in its sphere, independent of the others. To the Executive alone is intrusted the power of pardon; and it is' granted without limit. Pardon includes amnesty. It blots out the offense pardoned and removes all its penal consequences. It may be granted on conditions. In these particular pardons, that no doubt might exist as to their character, restoration of property was expressly pledged, and the pardon was granted on condition that the person who availed himself of it should take and keep a proscribed oath.
Now it is clear that the legislature cannot change the effect of such a pardon, any more than the Executive can change a law. Yet this is attempted by the provision under consideration. The court is required to receive special pardons as evidence of guilt and to treat them as null and void. It is required to disregard pardons granted by proclamation on condition, though the condition has been fulfilled, and to deny them their legal effect. This certainly impairs the Executive-authority and directs the court to be instrumental to that end.
We think it unnecessary to enlarge. The simplest statement is the best.
We repeat that it is impossible to believe that this provision was not inserted in the appropriation bill through inadvertence ; and that we shall not best fulfill the deliberate will of the legislature by denying the motion to dismiss and affirming the judgment of the Court of Claims; which is accordingly done.