RichardsoN, Oh. J.,
delivered the opinion of the court:
This action is brought by the assignee of Robert Erwin, under theprovisions of the following- act of Congress (19 Stat. L., 509), which became a law February 5, 1877, without the President’s approval:
“AN ACT for tbe relief of Robert Erwin.
"Be it enacted, &e., That the Court of Claims may take jurisdiction under the provisions of the act of March 12, 1863, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts withfti the United States,’ of the claims of Robert Erwin, of Savannah, Ga., for property alleged to have been taken from Mm, which claims were by accident or mistake of his agent or attorney, ancí without fault or neglect on his part, as is claimed, not filed within the time limited by said act.”
The petition, which was filed February 17, 1886, alleges, as the cause of action, that—
“ The said Robert Erwin, then acitizen of theStateof Georgia, on the 21st day of December, 1864, was the exclusive owner, in his own right, of 283 bales of upland cotton, stored in the said city of Savannah, which, on or about that day, was seized and captured by persons duly authorized and acting in behalf of the United States; and the proceeds of the sale made thereof, amounting-, as is believed and it is here charged, to the net sum of $49,618.39, were paid into the Treasury of the United States, pursuant to the provisions of the act of Congress, approved March 12,1863, chapter 120, commonly called the captured or abandoned property act.
‘•And on or about the 1st day of July, 1865, he was also the *415 owner, exclusively, and in bis own right, of another lot of 261 bales of sea-island cotton then stored at and in’the warehouse of Evans & Parnell, in the town of Thomasville, in said State of Georgia, which, on or about that day, was also so seized and captured by persons duly authorized and acting- in behalf of the United States, was removed to and stored at the Government cotton press in the city of Savannah, where it remained in the custody of said agents of the United States until in the month of August following, when it, was by them forwarded, upon the schooner Enchantress, to Simeon Draper, the United States Treasury agent in the city of New York, by whom it was subsequently sold for the account of the United States, and the proceeds thereof, amounting, as isbelieved and it is here charged, to the net sum of $119,857.54. were duly accounted for by said „ Simeon Draper, and were paid into the Treasury of the United States in conformity with the said captured or abandoned property act.
u On the 31st day of December, 1868, the firm of Erwin & Hardee, of which said Robert Erwin was a member, filed their petition in bankruptcy under the provisions of the acts of Congress relating thereto, in pursuance of which, on the 15th day of January, 1869, they were duly adjudged bankrupts.
“And in the proceedings had in such bankruptcy one Robert H. Footman was appointed and qualified as assignee of said Erwin & Hardee, and proceeded in the administration of the trust until February 23,1877, when, upon his resignation thereof, your petitioner, the claimant, was appointed to succeed him, and was duly qualified as assignee of said bankrupts; and the claimant now avers that under and in virtue of the assignment in bankruptcy of the property and estates of said Erwin & Har-dee, and each of them, and of the proceedings had in the court in that regard, theclaims of said Erwin, hereinbefore mentioned, against the United States, and for whichthis suit is prosecuted, became and now are vested in the claimant, who is now duly qualified and acting as assignee of said bankrupt as is herein-before alleged ”
The defendants file a motion to dismiss for want of jurisdiction, and also a general demurrer, under each of which three objections are raised against the claimant’s petition—
(1) It is argued that the act under which the suit is brought was, in the words of the title, “ for the relief of Robert Erwin,” and not for his creditors through the assignee in bankruptcy previously appointed, and that the latter acquired no rights thereby, both because it, the act, was not intended for him (Strong v. Hopkins, 2 Paine, 584), and because the right to sue was a valuable right or privilege acquired after the appointment of the assignee, and did not pass by the assignment.
*416 (2) It is also argued that an assignee in bankruptcy has no right to keep the estate open and bring actions nine years after his appointment. (Rev. Stat., § 5057; Bailey v. Glover, 21 Wall., 346; Walker v. Towner, 4 Dillon, 165.)
We express no iinal opinion on these two points, although we are inclined to think that one of them, at least, is well taken. They merit serious consideration and could not .be passed by did we not prefer to rest our decision upon the third objection, which concerns more particularly the jurisdiction of this court. But they will all be open to the defendants in the Supreme ■Court on appeal, if the case should go there.
(3) The third objection is that the claim, under the act of 1877, .accrued more than six years before the filing of the petition, and so is forever barred by the following section of the Revised ■Statutes, which was held by the Supreme Court in Haycraft's Case (22 Wall., 81, and 10 C. Cls. R., 108) t.o be jurisdictional:
Sec. 1069. Every claim against the United States cognizable by the Court of Claims, shall be forever barred unless the petition setting forth a statement thereof is filed in-the court, or transmitted to it by the Secretary of the Senate or the Clerk of the House of Representatives as provided by law, within six years after the claim first accrues:
“ Provided, That the claims of married women first accrued during marriage, of persons under the age of twenty-one years first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued, entitled to the claim, shall not be barred if the petition be filed in the court or transmitted, as aforesaid, within three .years after the disability has ceased; but no other disability than those enumerated shall prevent any claim from being barred, nor shall any of the said disabilities operate cumulatively.”
A claim first accrues, within the meaning of the statute, when .a suit may first be brought upon it, and from that day the six .years’ limitation begins to run. Any suit under the act of February 5, 1.877, might have been instituted by filing a petition within six years after that date. That time has long since passed, and thepresent claimant has lost his rights thereunder, if he ever had any, unless his caséis taken out of the operation of section 1069 of the Revised Statutes in either of two ways which his counsel present.
In his behalf it is insisted that the section applies only to claims which came under the general jurisdiction of the court *417 before its enactment, ancl not to claims founded upon special acts subsequently passed. We do not concur in this view. A similar doctrine in relation to the right of appeal under section 707 of the Revised Statutes was considered by the Supreme Court in Zellner’s Case (9 Wall., 244, and 7 C. Cls. R., 137). The court say:
“ It is supposed, as the act concerning abandoned and captured property conferred upon the Court of Claims a new subject of jurisdiction in addition to those previously provided for, and at the same time made no provision for appeals to the Supreme Court from their judgments or decrees, no right of appeal existed in respect to either party, and that the general provision in the fifth section of the act of March 3, 1863, reorganizing the court, and conferring what may be called its general jurisdiction, cannot be invoked in this case. We cannot agree to this view.
“ The language of the section is general: 1 Either party may appeal to the Supreme Court of the United States from any final judgment or decree which may hereafter be rendered in any case by said court.’
“ This court was organized as a special judicial tribunal to hear and render judgment in cases between the citizen and the Government; the subjects of'its jurisdiction were defined in the act, and generally the mode of conducting its proceedings, subject, of course, to such alterations and changes as Congress from time to time might see fit to make.
“The subjects of its jurisdiction could be enlarged or diminished, but this would not disturb or in any way affect the gen- . eral plan or system of its organization.
“ If now or additional subjects of jurisdiction were conferred, the effect would be simply to increase the labors of the court, the case to be heard and determined under the existing organization.”
In McKee's Case (10 C. Cls. R., 208) the Supreme Court held expressly that “ section 707 of the Revised Statutes gives to the United States the right of appeal from the adverse judgments of the Court of Claims in all cases where that court is required by any general or special law to tak^e jurisdiction of a claim made against the United States and act judicially in its determination.” And the Supreme Court took jurisdiction of an appeal from this court upon a judgment rendered against Robert Erwin under this very act of 1877, although the only authority for it was found in section 707 of the Revised Statutes.
There is no distinction in principle between the application *418 of tbe right of appeal under section 707, to special acts of legislation subsequently passed, and the application of the limitation of section 1069 to such cases.
The act of 1877 created a new and additional subject of jurisdiction and a new cause of action, by reviving an expired one, and in our opinion the general statute of limitation, as well as the general right of appeal, attaches and applies to it; just as when part payment on a promissory note takes a right of action thereon out of the statute, such right is not forever after relieved from all limitation, but the statute begins to run anew from the date of such payment.
It is now more than nine years since this court was opened anew to the rightful claimant, whoever he may be, under the act of 1877, and, according to-the construction urged by the present claimant, it is never to be closed until he be found, and of his own motion comes in and files his petition, a construction which, in our opinion, is'unreasonable and not to be adopted.
While Congress has declared a general limitation of six years for ‘-every claim cognizable by the Court of Claims,” and a still shorter one of two years for claims under the captured or abandoned property act, it is unreasonable to infer that it intended to confer upon every claimant under the act of 1877 — and the present one is the second who has appeared (Erwin’s Case, 13 C. Cls. R., 49, affirmed on appeal, 97 U. S. R., 392) — the unusual and extraordinary privilege, accorded to no other citizen, of bringing an action against the Government at any future time without limitation. Such a construction would be in conflict with all idea of repose, which is said to be the object of statutes of limitation, and to the general policy of Congress in all other cases.
It was said in Clarke’s Case (11 C. Cls. R., 702), decided a year before the passage of the act of 1877 now under consideration : “ It is not to be doubted that subsequent subjects of jurisdiction would be subject to the provisions of the statute of limitation if they were in the nature of money demands against the Government.” This was then, and has ever since been, the settled doctrine of this court, and we have no doubt Congress so understood it when the act of 1877 was passed.
That tjie present claim, under that act, is a money demand *419 against the Government, and nothing else, we shall demonstrate beyond question, we are quite confident.
• But the claimant argues that the property received and sold, and the proceeds thereof in the Treasury, under the peculiar legislation of the Captured or Abandoned Property Act of March 12,1863 (12 Stat. L., 820), are trust funds, of which the defendants are merely trustees, and are subject to the rules and practice of courts of equity in relation to equitable trusts, one of which is, that statutes of limitation do not run as between trustee and cestui que trust.
Some dicta in early opinions of the Supreme Court arising under that act have no doubt led to an erroneous impression that this court is to administer cases under it as though they were causes in equity, subject to the law of equitable trusts as applied in courts having chancery jurisdiction. In Klein’s Case (13 Wall., 128, and 7 C. Cls. R., 240), Chase, Chief Justice, in his opinion, said:
“The Government constituted itself the trustee for those who were by that act declared entitled to the proceeds of captured and abandoned property and for those whom it should thereafter recognize as entitled. * * * The property of the original owner is in no case absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of the property have passed into the possession of the Government, and restoration of the property is pledged to none except to those who have continually adhered to the Government. Whether restoration will be made to others, or confiscation will be enforced, is leit to be determined by considerations of public policy. * * * It was for the Government itself to determine whether these proceeds'should be restored to the owner or not.”
The doctrine now insisted upon as to trust and trusteeship is founded on that dicta. The case itself did not involve any consideration of the principles of equity as applied to trusts and to trustees, and it does not appear exactly what, if any, such principles the learned chief justice understood might be invoked in the execution of the statute. But he does say that it was for the Government itself to determine whether these proceeds should be restored to the owner or not.
While Mr. Chase was Secretary of the Treasury, and for some time afterwards, the money received from captured and abandoned property was merely deposited with the Treasurer, and was not technically, in departmental language, “covered *420 into tbe Treasury,” an’d so, according to tbe construction then given by tbe Department, was not subject to tbe constitutional provision that “ no money shall be drawn from the Treasui'y but in consequence of appropriations made by law.” (Const., ■art. I, § 9, par. 7.) More than two and a half million dollars of it was paid out by Secretaries Chase, Fessenden, and McCulloch (Hodge’s Case, 18 C. Cls. R., 704) without any appropriation therefor, when Congress interposed and passed tbe joint resolution of March 30, 1868, No 25 (15 Stat. L., 251).
That resolution required all moneys received from sales of captured and abandoned property to be paid into tbe Treasury of the United States, and they were thereupon “ covered into the Treasury ” and mingled with other public money. No account has since been kept of tbe same as a separate fund, and as such they are not known except outside the Treasury Department. Receipts and expenditures are entered as in other cases, and the statements which, from time to time, have been made, by request, relating thereto have been taken from the scattered items of receipts and expenditures. (Hodge’s Case, 18 C. Cls. R., 700.)
The permanent appropriation for the payment of judgments of this court in captured and abondoiied property cases is not chargeable to any fund, but is payable “ out of any moneys in the Treasury not otherwise appropriated.” (Rev. Stat., § 3689.)
It is not at all improbable that this legislation, enacted after Secretary Chase had left the Department, escaped the observation of the Chief Justice when he wrote the dicta quoted from his opinion in Klein’s Case.
A trust in which the so-called trustee may legally mingle the trust money with his own, employ it for his own use, and himself determine whether he will forever retain it, or will give it to others, is a singular trust, unknown to law or equity, and to which no principles of equity jurisprudence can be found to apply.
It is a universal rule of equity that if a trustee mingles trust money with his own and uses it for his own benefit he shall account for or pay interest thereon to the cestui que trust. (Story’s Equity, §§ 1277, 1277a; Perry on Trusts, § 468.)
But it is provided in Revised Statutes as follows :
“ Seo. 1091. No interest shall be.allowed on any claim up to the time of the rendition of judgment thereon by the Court of *421 Claims, unless upon a contract expressly stipulating for the payment of interest.”
This court has always applied that section to. cases under subsequently enacted special acts and to those under the captured or abandoned property act.
The claimant here might as well invoke the rule of equity as to interest and demand payment of interest on the money received for the cotton in question, notwithstanding section 1091 of the Reviséd Statutes, as to invoke the equitable rule that statutes of limitation do not run in favor of trustees against the beneficiaries of the estate held by them.
But more recent decisions and the practice of this court and of the Supreme Court have swept away all such ideas of trust in connection with the property or money received under the captured or abandoned property act.
In Haycraft's Case (22 Wall., 94, 95, and 10 C. Cls. 11., 110, 111, 112) the Supreme Court said, respecting captured or abandoned property, speaking by Chief-Justice Waite:
“ The act of Congress looked to its preservation, but authorized its capture. In so doing Congress acted within its constitutional power to ‘make regulations concerning captures on land and water.’ (Art. 1, § 8, par. 11.) In the indiscriminate seizure which was likely to follow such an authority it was anticipated that friends as well as foes might suffer. Therefore, to save friends, it was provided that any person claiming to have been the' owner might, at any time within two years after the suppression of the rebellion, prefer his claim, and, upon proof of his ownership and loyalty, receive the money realized by the United States from the sale of the property.
That expresses all there is of the trust or the remedy provided.” * * *
This certainly does not recognize much of a trust. It is no more so than is that upon which every person holds the property which is exclusively his own — to be managed as he sees fit and to be disposed of as he pleases. In such a trust, if that be not a misnomer, the special principles of equity do not apply and courts of equity do not interfere.
In Burke’s Case (13 C. Cls. R., 231) this court, speaking by Judge Bancroft Davis, said :
“ It is argued that this court sits as a court of equity in proceedings under the captured and abandoned property act, and that we must resort to equity to determine the status of this claimant. * * *
*422 “Ad early attempt of this court to render judgment under the general act for specific performance (Alire’s Case, 1 C. Cls. R., 233) was met by the Supreme Court by the remark that ‘it is quite clear that the limited power to render a judgment confines the subject-matter to cases in which the petitioner sets up a moneyed demand as due from the Government.’ (Alire’s Case, 6 Wall., 573.)
“ Shortly afterward, the same court held that this court ‘was authorized to enforce legal rights and obligations, but it could not proceed further and judge of the equities between a citizen and his government. * * * The Government has not thought fit to allow itself to be sued in the Court of Claims on equitable considerations.’ (Bonner’s Case, 9 id., 156.)
“About the same time, a question being raised concerning proceedings in cotton cases, the same court said‘no special proceedings are prescribed by the Court of Claims ’ by the captured and abandoned property act, but ‘they are to proceed in the usual way to hear and adjudicate upon the question of ownership and right to the proceeds according to the proofs and the law of the case.’ (Zellner’s Case 9, id., 244.)
“ Nearly simultaneously with these proceedings, however, the Supreme Court, in casual expressions in two cases, referred to the United States as a trustee holding the proceeds of captured and abandoned property for the owner’s benefit (Anderson’s Case, 9 id., 56; Padelford’s Case, 9 id., 531), which expressions were repeated in two subsequent cases (Klein’s Case, 13 id., 128; Intermingled Cotton Cases, 92 U. S. R., 651). From these casual expressions it is argued that we are possessed of the equity jurisdiction necessary to administer upon trusts, and that the Supreme Court was mistaken when it said that ‘the Government has not thought fit to allow itself to be sued in the Court of Claims on equitable considerations.’
“That court, in calling the United States a trustee, may have referred to the large class of trusts cognizable at law. In its broad legal sense the word trust embraces many transactions and relations of business and property which are administered in courts of common law in States where two systems of jurisprudence and of remedies exist side by side. The familiar cases-of bailments and of money had and received to the use of another are instances of such trusts.
“The court may well have compared the relations of the Government toward the fund in the Treasury to this class of trusts. It is less probable that it intended to convert those relations into an equitable trust, since the essential elements of personal confidence and trust reposed in the depositary by the creator of the trust are wholly wanting. The language of Chief-Justice Waite in Haycraft’s Case, where he ‘expresses all there is of the trust’ (22 Wall., 94), warrants this conclusion.
“In administering upon the cotton cases this court has *423 neither assumed to act as a court of equity nor as a court of common law, but simply as the Court of Claims. Dicta of individual judges may afford ground for arguing in favor of equity jurisdiction in case of necessity, but no necessity for its exercise has yet arisen.”
Moreover, if actions upon claims for the proceeds of property received under the provisions of the captured or abandoned property act were to be tried in equity, this court would have been relieved from making findings of fact in such cases, and the whole record, evidence and all, would be sent up to the Supreme Court on appeal. (Hot Springs Cases, 10 C. Cls. R., 345; 92 U. S. R., 698, and 11 C. Cls. R., 238; Eastern Band of Cherokees Case, 20 C. Cls. R., 461, and 117 U. S. R., 288.)
But this court and the Supreme Court have never>so regarded them, and a finding of fact has been required and has been made in every case under the abandoned or captured property act, as in other actions at law, and not in equity. (See De Groot’s Case, 5 Wall., 419, and 7 C. Cls. R., 2; McMahon’s Case, 14 Wall., 109, and 7 C. Cls. R., 282; Pugh’s Case, 99 U. S. R., 271.) Nor has there been a single case where, in this court or in the Supreme Court, the special and peculiar principles of equity jurisprudence have been applied.
In Taylor's Case (104 U. S. R., 216, 222) the Supreme Court called the United States trustees of the surplus money paid into the Treasury from the sales of lands for taxes under the direct tax acts (12 Stat. L., 292, 422, 640; 14 Stat. L., 568) over and above that which was required to pay the tax, interest, and costs. That court did not treat the case as one in equity, and upon a findings of fact by this court, as in cases at law, they held, as to the statute of limitations, that “the right of the owner of the land to recover the money which the Government held for him as his trustee did not become a claim on which suit could be brought, and such as was cognizable by the Court of Claims, until demand therefor had been made at the Treasury. Upon such demand the claim first accrued,” and the statute of limitation began to run. So in the present case, a suit cognizable by the Court of Claims could not have been brought after thelimitation ofthe captured or abandoned property act had expired, until the passage of the act of 1877 specially authorizing it, and from that time the statute of limitation began to run and had run out long before the claimant came into court.
The petition is dismissed.