Mr. Justice Field
delivered the opinion of the court:
This case comes before us from the Court of Claims. The claimants are subjects of the Queen of Great Britain, but they were residents within the United States prior to the war of the rebellion, and during its continuance. ‘In 186-1 they were the owners of 65 bales of cotton stored on a plantation in Alabama. This cotton was seized during that year by naval officers of the United States and turned over to an agent of the Treasury Department, by whom the cotton was sold and che proceeds paid into the Treasury. The present action was brought in the Court of Claims, under the act of Congress of March 12, 1863, known as the Captured and abandoned property Aet, to recover these proceeds.
The court found that the claimants were the owners of the cotton, and that it was seized and sold as stated, and that the net proceeds, amounting to $13,232, were paid into the Treasury.
The court also found that the government of Great Britain accords to citizens .of the United States the right 'to prosecute claims against that government in its own courts j but that the claimants were engaged, in 1862, in manufacturing saltpeter in Alabama, and selling that article to the Confederate States, and that they thus gave aid and comfort to the rebellion, and for that reason were not entitled to recover the proceeds of the cotton seized. Their petition was accordingly dismissed.
The circumstances attending the manufacture and sale of the saltpeter, as disclosed in the findings of the court, plainly show that the claimants knew that the saltx>eter was to be used by the confederates in the manufacture of gunpowder for the prosecution of the war of the rebellion, and there is little doubt that the sale was made in order to aid the confederates in accomplishing their treasonable purposes. By thus furnishing materials for the prosecution of the war while they were domiciled *160 in the.country, knowing the uses to which the materials were to be applied, the claimants became participators in the treason of the confederates equally as if they had been original conspirators with them. The Court of Claims, therefore, did not err in its conclusion that the act of the claimants in selling the saltpeter to the confederates, under these circumstances, was an act of aid and comfort to the rebellion. We have already held, in Hanauer v. Doane, (12 Wall., 347,) and we repeat and reaffirm what we there said, that “ He who, being bound by his allegiance to a government, sells goods to the agent of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of treason or a misprision thereof.. He voluntarily aids the treason. He cannot be permitted to stand on the nice metaphysical distinction that, although he knows that the purchaser buys the goods for the purpose of aiding the rebellion, he does not sell them for that purpose. The consequences of his acts are too serious and enormous to admit of such a plea. He must be taken to intend the consequences of his own voluntary act.”
But the aid and comfort thus given to the rebellion bythe claimants did not justify a denial of their right to recover the proceeds of their property in the Treasury of the United States after the proclamation of pardon and amnesty made by the President on the 25th of December, 1S68, unless their character as aliens excludes them from the benefit of that proclamation, a question which we shall presently consider. Assuming that they are within the terms of the proclamation, the pardon and amnesty granted relieve them from the legal consequences of their participation in the rebellion, and from the necessity of proving that they had not thus participated, which otherwise would have been indispensable to a recovery. ■ It is true, the pardon and amnesty do not and cannot alter the actual fact that' aid and comfort were given bythe claimants, but they forever close the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened.
There has been some difference of opinion among the members of the court as to cases covered by the pardon of the President, but there has been none as to the effect and operation of a pardon in cases where it applies. All have agreed that the pardon not merely releases the offender from the pun- *161 isbment prescribed for tire offense, but that it obliterates in legal contemplation the offense itself.
When, therefore, in Padelford’s Case, (7 C. Cls. R., p. 144,) a claimant under the Captured and abandoned property Act, who liad giren aid and comfort to the rebellion, appeared in the Court of Claims, ashing for'a restoration of the proceeds of his property, and showing that "he had taken the oath prescribed by the proclamation of President Lincoln, of December 8,1863, and had since then kept the oath inviolate, and was thereby by force of the proclamation pardoned, this court held that after the pardon thus granted no offense connected with the rebellion could be imputed to him $ that if, in other respects, he made the proof which under the act entitled him to a decree for the proceeds of his property, the law made the proof of pardon a. complete substitute for proof that he had given no aid or comfort to the rebellion; and that a different construction would defeat the manifest intent of the proclamation and of the act of Congress which authorized it.
In Klein’s Case, (7 C. Cls. R., p. 240,) which subsequently came before the court, an act of Congress designed to deny to the pardon ox the President the effect and operation which the court had thus adjudged to it, and which declared that an acceptance of pardon without disclaimer should be conclusive evidence of the acts pardoned, and be inoperative as-evidence of the rights conferred by it in the Court of Claims and in this court, was held to be unconstitutional and void.
In Mrs. Armstrong’s Case, (7 C. Cls. R., p. 280,) which was here at the last term, the court declined to consider whether the evidence was sufficient to prove that the claimant had given aid and comfort to the rebellion, and held that the proclamation of pardon and amnesty issued by the President on the 25th of De-' cember, 1868,'entitled her to the proceeds of her captured and abandoned property in the Treasury, without proof that she never gave such aid and comfort; that the proclamation granting pardon unconditionally, and without reservation, was a public act of which all courts of the United States were bound to take notice, and to which all courts were bound to give effect.
In Pargoud’s Case, (7 C. Cls. R., p. 289,) also here at the last term, the claimant stated in his petition that he was guilty of participating in the rebellion, but that he had been pardoned by the *162 President, by special act, in January, 1866, and also by operation of the President’s general proclamation. The Court of Claims decided against the claimant on the ground that his petition did not aver that he had not given any aid or comfort to thfe rebellion, and did not sufficiently aver a pardon by the President. This court reversed the judgment, following- the decision in Jirs. Armstrong’s Case, and holding that the President’s proclamation of December 25,1868, relieved claimants of captured and abandoned property from proof of adhesion to the United States during the civil war.
After these repeated adjudications, it must be regarded as settled in this court that the pardon of the President, whether granted by special letters or by general proclamation, relieves claimants of the proceeds of captured and abandoned property from the consequences of participation in the rebellion, and from the necessity of establishing their loyalty in order to prosecute their claims. This result follows whether we regard the pardon as effacing the offense, blotting it out, in the language of the cases, as though it had never existed, or regard persons pardoned as necessarily excepted from the general language of the act, which requires claimants to make proof of their adhesion, during the rebellion, to the United States. It is not to be supposed that Congress intended by the general language of •the act to encroach upon any of the prerogatives of the President, and especially that benign prerogative of mercy which lies in the pardoning power. It is more reasonable to conclude that claimants restored to their rights of property by the pardon of the President were not in contemplation of Congress in passing the act, and were not intended to be embraced by the requirement in question. All general terms in statutes should be limited in their application, so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible. It will be presumed that exceptions were intended which would avoid results of that nature.— United States v. Kirby, (7 Wall., 482.)
Such being the general effect of pardon and amnesty granted by the President, it only remains to consider whether the proclamation of December 25, 1868, embraces the claimants, who were aliens domiciled in the country, within its provision's. And upon this point we entertain no doubt. The claimants were residents in the United States prior to the commencement *163 of tbe rebellion. They so allege in their petition ; they were, therefore, bound to obey all the laws of the country, not immediately relating to citizenship, during their sojourn in it; and they were equally amenable with citizens for any infraction of those laws. “The rights of sovereignty,” says Wildman, in his Institutes on International Law, (p. 10,) “ extend to all persons and things not privileged that are within the territory. They extend to all strangers therein, not only to those who are naturalized and to those who are domiciled therein, having taken up their abode with the intention of permanent residence, but also to those whose residence is transitory. All strangers are under the protection of the sovereign while they are within his territories, and owe a temporary allegiance in return for that protection.”
Ey allegiance is meant the obligation of fidelity and obedience which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. The citizen or subject owes an absolute and permanent allegiance to his government or sovereign, of at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien while domiciled in the country owes a local and temporary allegiance, which continues during the period of his residence.
This obligation of temporary allegiance by an alien resident in a friendly country is everywhere recognized by publicists and statesmen. In the ease of Thrasher, a citizen of the United States resident in Cuba, who complained of injuries suffered 'from the government of that island, Mr. Webster, then Secretary of State, made, in 1851, a report to the President in answer to a resolution of the House of Eepresentatives, in which he said: “ Every foreigner born residing’ in a country owes to that country allegiance and obedience to its laws so long as he remains in it, as a duty upon him by the mere fact of his residence and that temporary protection which he enjoys, and is as much bound to obey its laws as native subjects or citizens. This is the universal understanding iu ail civilized states, and nowhere a more established doctrine than in this country.” And again: “ Independently of a residence with intention to cou-tinue Such residence; independently of any domiciliation; inde *164 pendently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that, by the public law, an alien or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may b6punished for treason or other crimes as a native-born subject might be, unless his case is varied by some treaty stipulation.” (Webster’s Works, vol. 6, p. 526.)
The same doctrine is stated in Hale’s Pleas of the Crown, vol. 1, chap. 10; East’s Crown Law, vol. 1, chap. 2, sec. 4; and Foster’s Discourse upon High Treason, sec. 2, p. 185 ; all of which are treatises of approved merit.
Such being the established doctrine, the claimants here were amenable to the laws of the United States prescribing punishment for treason and for giving aid and comfort .to the rebellion. They were, as domiciled aliens in the country prior to the rebellion, under the obligation of fidelity and obedience to the Government of the United States. They subsequently took their lot with the insurgents, and would be subject like them to punishment under the laws they violated but for the proclamation of the President of December 25, 1868. That proclamation, in its comprehensive terms, includes them and all others in like situation. It -grants, “ unconditionally, and without reservation, to all and to every person who, directly or indirectly, participated in the late insurrection or rebellion a full pardon and amnesty for the offense of treason against the United States, or of adhering to their enemies during the lats civil war, with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made, in pursuance thereof.”
The Act July 27,1868, (15 Stat. L., 243,) authorizes any alien to prosecute claims against the United States in the Court of Claims where the government of which he is a citizen or subject accords to citizens of the United States the right to prosecute claims against such government in its courts. In O’Keefe’s Case (7 C. Cls. R., p. 192) it was held that, by the proceeding known as a “petition of right,” the government of Great Britain accords to citizens of the United States, the right to prosecute claims against that government iu its courts, and therefore that British, subjects, if otherwise entitled, may prosecute claims against the United States in the Court of Claims. There is, *165 therefore, no impediment to the recovery by the claimants in this case of the net proceeds of their cotton paid into the Treasury.
The judgment oí' the Court of Claims must therefore be reversed, and that court directed to enter judgment in favor of the'claimants for the amount of such net proceeds j and it is so ordered.