Mr. Justice Field
dissenting:
I am compelled to dissent from the judgment of the court in this case, and from the reasons stated in the opinion upon which that judgment is founded. The opinion appears to me to proceed upon the assumption that this is an action to enforce a contract which was illegal in its inception, and therefore without standing in a court of justice. And the cases of Hanauer v. Doane (12 Wall., 342) and Hanauer v. Woodruff (15 Wall., 349) are cited in support of the position that contracts of this character will not be upheld. Those authorities do establish the position that contracts entered into for the purpose of aiding the late insurrectionary government are illegal and void, and will not be enforced by the Federal tribunals. In the first the action was upon two ■ promissory notes, the cousideration of which consisted in part of stores and supplies furnished the defendant, an army contractor of the con *15 federate government, with knowledge that they were to be used in aid of the rebellion, and in part of due-bills issued by the contractor to other parties for similar supplies, and taken up at his request j and the court held that the sale of the goods, being made with the vendor’s knowledge of the uses to which they were to be applied, was an illegal transaction and did not constitute a valid consideration for the note of the purchaser, and that the due-bills given by him for similar goods, being taken up by third parties with knowledge of the purpose for which they were issued, were equally invalid as a consideration for his note in their hands. In the second case the action was upon a promissory note, the only consideration of which consisted of certain bonds, issued by the convention of Arkansas which attempted to carry that State out of the Union, and issued for the purpose of supporting the war against the Federal Government, and styled “war bonds” on their face, and one of the questions presented for our determination was whether the consideration was illegal under the Constitution and laws of the United States. And the court answered that it did not admit of a doubt that the consideration was thus illegal and void5 that “if the Constitution be, as it declares on its face it is, the supreme law of the land, a contract or undertaking of any kind to destroy or impair its supremacy, or to aid or encourage any attempt to that end, must necessarily be unlawful, and can never be treated, in a court sitting under that Constitution and exercising authority by virtue of its provisions, as a meritorious consideration for the promise of any one.”-
In both of these cases the aid of the courts was sought to enforce unexecuted contracts which were illegal and void in their inception, because made in aid of the rebellion, and all that they decide is that contracts of that character can never be enforced in the courts of that Government against which the rebellion was raised. In those courts such contracts stand on the same footing as other illegal transactions ; they will not be upheld nor enforced. In both of those decisions I concurred, and in the second case I wrote the opinion of the court. I still adhere to the views expressed in both cases.
But, with great respect for my associates, I am compelled to say that,, in my judgment, neither of those cases has any just application to the case at bar or to any question properly involved in its decision. This action is not brought to enforce *16 an unexecuted contract, legal or illegal. There is no question of enforcing a contract in the case. The question, and the only question, is whether the cotton seized by the forces of the United States in May, 1865, was at the time the property of the claimant. If it was his property, then he is entitled to its pro-eeeds, and the judgment of the Court of Claims should be reversed; and in determining this question we are not concerned with the consideration of his loyalty or disloyalty. He was a citizen of Mississippi and resided within the lines of the confederacy, and the act forbidding intercourse with the enemy does not apply to his case. He was subject to be treated, in common with other citizens of the confederacy, as a public enemy during the continuance of the war. And if he were disloyal in fact, and if by his purchase of the cotton he gave aid and comfort to the rebellion, as this court adjudges, the impediment which such conduct previously interposed to the prosecution of his claim was removed by the proclamation of pardon and amnesty made by the President on the 25th day of December, 1868. He was included within the terms of that beneficent public act of the Chief Magistrate of the United States as fully as if he had been specifically named therein. That pardon and. amnesty did not of course and could not change the actual fact of previous disloyalty, if it existed, but, as was said in Carlisle v. The United States, (16 Wall., 151, 8 C. Cls. R., 153,) l(they forever close the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened.” In legal contemplation the Executive pardon not merely releases an offender from the punishment prescribed for his offense, but it obliterates the offense itself.
In the present case, therefore, the question of the loyalty or disloyalty of the claimant is withdrawn from our consideration; and as the Non-intercourse Act does not apply to his case, it does not concern the United States whether he acquired the property from another public enemy or from one of the States of the confederacy, or from an agent of the confederate government. He was in possession of the property at the time of the seizure, asserting ownership to it; and no one then disputed and no one since has disputed his title. Who then owned the property if he did not ¶ The United States did not own it. They did not acquire by its seizure any title to the property. *17 They have never asserted any greater rights arising from capture of property on land, in the hands of citizens engaged in the rebellion, than those which one belligerent nation asserts with reference to such property captured by it belonging to the citizens or subjects of the other belligerent. All public property which is movable in its nature, possessed by one belligerent, and employed on land in actual hostilities, passes by capture. But private property on land, except such as becomes booty when taken from enemies in the field or besieged towns, or is levied as a military contribution upon the inhabitants of the hostile territory, is exempt from confiscation by the general law of nations. Such is the language of Mr. Wheaton, who is recognized as authority on all questions of public law. And “ this exemption,” he adds, “ extends even to the case of an absolute and unqualified conquest of the enemies’ country.” (Law of Nations, Lawrence’s edit., 596.)
In Brown v. The United States, (8 Oranch, 192,) the question arose whether enemy’s property found on land at the commencement of hostilities with Great Britain, in 1812, could be seized and condemned as a necessary consequence of. the declaration of war; and the court held that it could not be thus condemned without an act of Congress authorizing its confiscation. The court, speaking through Chief-Justice Marshall, said that it was conceded that war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, and observed that the mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, might more or less affect the exercise of this right, but could not impair the right itself. “ That,” said the court, u remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will.” “ But,” added the court, “ until that will shall he expressed, no power of condemnation can exist in the court.”
It may be doubted whether the right to confiscate property of the enemy wherever found, which is here stated to have been conceded, would at this day be admitted without some qualification excepting private property on land not engaged in actual hostilities or taken as booty or levied as a military contribution, as stated by Mr. Wheaton. Be that as it may, the decision is emphatic that until Congress, by some legisla *18 tive act, directs the confiscation of private property on land, none can be ordered by the courts.
Now, Congress has only provided for the confiscation of private property of persons engaged in the rebellion by the Act August 6,1861, (12 Stat. L., 319,) and that of July 17, 1862, (id., 589.) Both of these acts require legal proceedings resulting in a judicial decree of condemnation before the title of the owner can be divested. The present case is not brought under either of these acts. No proceedings for the condemnation and forfeiture of the cotton seized, or of its proceeds, have ever been instituted by the G-overnment. The title of the claimant remains, therefore, at this day, as perfect as it did on the day the cotton was seized.
In the case of the United States v. Klein (13 Wall., 136, 7 C. Cls. B., 240) this court had occasion to consider the rights of property, as affected by the war, in the hands of citizens engaged in hostilities against the United States, and it held, after mature consideration, that the effect of the Act March 12,1863, to provide for the collection of captured and abandoned property in insurrectionary districts, under which the present action is brought, is not to confiscate or in any case absolutely divest the property of the original owner, even though disloyal, and that by the seizure the Government constituted itself a trustee for those who were by that act declared entitled or might thereafter be recognized as entitled to the proceeds.
But it is contended that the Confederate government, being' unlawful in its origin and continuance, was incapable of acquiring, holding, or transferring a valid title to the property. The court below so held in terms, and this court so far sustains that ruling as to declare that the claimant could not acquire any title to the cotton seized by purchase from that government.
Assuming that the Confederate government was thus incapable of acquiring or transferring title to property, the result claimed by the Attorney-General and held by the ^majority of this court would not in my judgment follow. That organization, whatever its character, acted through agents. Those agents purchased and sold property. The title of the vendors passed to somebody. If it did not vest in the Confederate government, because that organization was incapable of taking *19 the property, it remained with the agents. The sale of the vendors was a release and quit-claim of their interest, and when that took place the property was not derelict and abandoned. Whatever title existed to the property was therefore in the agents, if their assumed principal had no existence, and by their sale passed to purchasers from them. Undoubtedly larceny could be alleged against one who feloniously took the property from such purchaser. The taker would not be allowed, in any court which administers justice, to escape punishment by showing that no title passed to the purchaser because his vendor was the agent or assumed to be the agent of a government which had no legal existence. And it is equally clear that the purchaser could have maintained an action for'injuries to the property thus purchased, or for its recovery if forcibly removed from his possession by a third party. The plea that the property was not his because obtained from the agent or a person assuming to be the agent of an unlawful political organization would not be held a justification for the injuries or the detention.
But I do not desire to place my objection to the decision of the court upon this view of the case. I place it on higher ground, one which is recognized by all writers on international law, from Grotius, its father, to Wheaton and Phillemore, its latest expounders, and that is, that a government de facto has, during its continuance, the same right within its territorial limits to acquire and dispose of movable personal property which a government de jure possesses. And that the confederate government, whatever its character in other respects, possessed supreme power over a large extent of territory, embracing several States and a population of many millions, and exercised that power for nearly four years, we are ail compelled to admit. As stated by this court, speaking through Mr. Justice Nelson, (Mauran v. Insurance Company, 6 Wall, 14,) it cannot be denied that, by the use of unlawful and unconstitutional means, “ a government in fact was erected greater in territory than many of the old governments in Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources, in men and money, to carry on a civil war of unexampled dimensions ; and during all which time the exercise of many belligerent rights were either conceded to it or were acquiesced in by *20 the supreme government, such as the treatment of captives both on land and sea as prisoners of war; the exchange of prisoners; their vessels captured recognized as prizes of war, and dealt with accordingly; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded, and the blockade maintained by a suitable force and duly notified to neutral powers, the same as in open and public war.
In Thorington v. Smith (8 Wall., 10) this court placed the Confederate government among that class of governments de facto, of which the temporary governments at Castine and Tampico were examples, and said, speaking through Chief-Justice Chase, that “ to the extent of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned. That supremacy did not justify acts of hostility to the United States. How far it should excuse them must be left to the lawful, government upon the re-establishment of its authority. But it made obedience to its authority in civil and local matters not only a necessity, but a duty. Without such obedience civil order was impossible.”
With these authorities before me I should unhesitatingly have said — but for the fact that a majority of my associates differ from me, and the presumption is that they are right and I am wrong — that it was impossible for any court to come to the conclusion that a government thus organized, having such immense resources and exercising actual supremacy over such vast territory and millions of people, did not posséss the power to acquire and to transfer the title to personal property within its territorial limits.
Our Government, in its efforts to reach the property of the extinct confederacy, has asserted a very different doctrine from that announced in the court below, and, so far as the cotton seized in this case is concerned, approved here. It has alleged in the courts of England that that confederacy did acquire property to a vast amount, and attempted to reach it in the hands of its agents. In United States v. McRea, (8 Law R., Equity, 69,) it filed a bill in the court of chancery in England to obtain an account of all moneys and goods which came to the hands of the defendant, as agent or otherwise, on behalf of the Confederate government during the insurrection, and the *21 payment of the moneys which, on taking such account, might be in his hands, and a delivery over of the goods in his possession. The bill alleged that the Confederate government possessed itself of divers moneys, goods, and treasure, part of the public property of the United States, and that other moneys and goods were from time to time paid and contributed to it by divers persons, inhabitants of the United States, or were seized and acquired by that government in the exercise of its usurped authority; that it had sent to agents and other persons in England large amounts of money to be laid out in purchasing goods for its use, and had sent there large quantities of goods to be sold; that it had thus sent large sums of money and large quantities of goods to the defendant, and that on the-dissolution of that government he had them in his possession. And the bill claimed that all the joint or public property of the persons constituting the Confederate government, including the said moneys and goods, had vested in the United States and constituted their absolute property, and ought to be paid and delivered to them. The court held that the moneys, goods, and treasure which were at the outbreak of the rebellion the public property of the United States, and which were, seized by the rebels,' still continued the moneys, goods, and treasure of the United States, their rights of property and rights of possession being in no wise divested or defeated by the wrongful seizure; but that with respect to property which, had been voluntarily contributed to or acquired by the insurrec-tionary government, and impressed in its hands with the character of public property, the right of the United States was that of a successor of the Confederate government; and that they could recover such property from an agent of that government, but subject, however, to the same rights and obligations to which that government would have been subjected had it not been overthrown.
In the case of The United States v. Prioleau, (2 Hem. & M. Chancery Cases, 559,) the same court again held that the Government of the United States could recover the property of the Confederate government, as its successor or representative, in the hands of its agents, but that they must take it subject to all the liens and conditions arising from the contract upon which the property was received by the agents. Neither the United States, in the prosecution of these suits, *22 nor the courts of England in deciding them, expressed the slightest doubt that the title to the property not originally owned by the United States had been acquired by the Confederate government, which was in the hands of its agents. And I submit that a response by those courts to the claim of the United States, that the insurgent government, being illegal in its origin and continuance, could neither take, hold, nor transfer title to personal property, would not have been acquiesced in nor deemed respectful by our Government. And I submit respectfully that the eloquent denunciation of the wickedness of the rebellion, contained in the opinion of the majority, is no legal answer to the demand of the claimant for the proceeds of his property seized and sold by our Government, when that Government long since pardoned the only offense of Which that claimant was guilty, and thus gave him the assurance that he should stand in the courts of his country in as good plight and condition as any citizen who had never sinned* against its authority.
I am therefore of the opinion that the judgment of the Court of Claims should be reversed.