Nott, J.,
delivered the opinion of the court:
The only question in this case is, whether an alien, domiciled during the rebellion within the insurrectionary States, can be guilty of the crime of treason against the Government of the United States.
“ Treason is the breach of allegiance, and can be committed by him only who owes allegiance, either perpetual or temporary.” (The United States v. Wiltberger, 5 Wheat. R., p. 97.) Under what conditions does this temporary allegiance arise ? and upon what terms does its obligation depend ? When the resident alien was innocent of bringing on the rebellion, and did not infringe any municipal law of the United States so long as it was paramount, and has not been guilty of auy overt act of war, is any infraction of his strict neutrality to be accounted a breach of this allegiance and a crime?
So far as aliens resident within the loyal States are con *417 cerned, there can be no question but that they owed this temporary allegiance to the Government within whose protection they voluntarily came. But, in the case of an alien not receiving such protection, residing in the territory of a belligerent, and under a government defacto which claimed the right and exercised the power of making laws and exacting obedience, can it be said that he owed temporary allegiance to a government practically at a distance, and which was at most a government de jure seeking to re-establish its authority by force of arms ? In the case of an alien who did nothing to violate the laws of the United States, so long as they were paramount, can it be maintained that he violates them, within the intent of the rule, after they have been effectually silenced by actual hostilities, and are, for the time, superseded by the laws of a government defacto ? Will it be conceded by other nations that their citizens resident during the rebellion in the Southern States can be convicted and punished as criminals for such trivial acts of aid and comfort as they might have done lawfully in their own country 1 And will it be conceded that a constructive allegiance to the United States continued after the alien’s own government had recognized in the Confederacy a belligerent power % And did not, according to some of the authorities, such an alien owe a temporary allegiance to the government defacto ? And is there any such thing as an alien owing temporary allegiance at the same time to two different powers, because the one claims to be de jure, while the other exercises sovereignty de facto ? What was the obligation of those aliens who came in under the Confederate power after the war had begun and to whom the protection of the United States never in any sense attached ? In short, do aliens domiciled within the insur-rectionary districts come under the international obligations of neutrals, or are they liable to all the pains and penalties of criminal law ?
. When we go to the books we find that “ treason in its very name imports a betraying, treachery, or breach of faith ,” (4 Blks., p. 53,) and “ can be committed by Mm only who owes allegiance,” (5 Wheat. R., p. 97.) This owing of allegiance, and this betraying, treachery, or breach of faith, in the case of resident aliens, is ascribed, it is believed, by every writer who is an authority upon the subject, to the reciprocal obligation of protection on the part of the government.
*418 “Aliens may commit treason; for as there is a local protection on the King’s part, so there is a local allegiance on theirs. There is no distinction whether the alien’s sovereign is in amity or enmity with the Crown of England. If, during his residence here, under the protection of the Grown, he does that which would constitute treason in the natural-born subject, he may be dealt with as a traitor.” (Tomlin’s Law Dic.)
“ Local allegiance is that which is due from the alien while resident in a cowvtry, in return for the protection afforded by the government.” (1 Bouvier’s Law Dic., 115.)
“Allegiance, we may remember, was distinguished into two species: the one natural or perpetual, which is inherent only in natives of the King’s dominions the other local and temporary, which is incident to aliens also. In indictments for treason it is material to allege that the party owed allegiance and fidelity to the state against which the treason was committed, and this allegation seems equally material in a charge of misprision of treason. It may be proved by evidence that the party was by birth a citizen of the State or of the United States, as the case may be, or an alien who was resident here with his family and effects ; and if he were gone abroad, leaving his family and effects, his allegiance is still due for the protection which is afforded them.” (3 Greenleaf on Ev., sec. 239.)
“Allegiance, both express and implied, is, however, distinguished by the law into two sorts or species, the one natural, the other local; the former also being perpetual, and the latter temporary. * * * Local allegiance is such as is due from an alien, or stranger born, for so long a time as he continues within the King’s dominion and protection.” (1. Blks, 369 370; and to the same effect is Story on the Conflict of Laws, sec. 21.)
“If an alien, the subject of a foreign prince in amity with the King, live here and enjoy the benefit of the King’s protection, and commit a treason, he shall be judged and executed as a traitor, for he owes a local allegiance.” (Hale’s Pleas of the Crown, p. 59.)
“Local allegiance is that which is due from a foreigner during his residence here, and is founded in the protection he enjoys for his own person, his family, and effects, during the time of that residence.” (1 East’s Crown Law, chap, ii, sec. 4.)
“An alien whose sovereign is at enmity with us, living here under the King’s protection and committing offenses amounting *419 to treason, may likewise be dealt with as a traitor. For he oweth a temporary local allegiance founded, on that share of protection he receiveth.” (Foster’s Discourse on High Treason, 185, sec. 2.)
And it is believed that the quotations may be continued through the whole list of authors who have written upon treason.
But since this case has been under consideration the Supreme Court has decided that of Carlisle & Henderson, (ante.) Two Englishmen, resident within the insurrectionary States, were engaged in the manufacture of saltpeter there. They did nothing to bring about the rebellion nor in any way violated the municipal law of the United States. After the authority of the United States had ceased to be paramount, they did not take up arms nor commit any overt act of hostility, but continued their business of making and selling saltpeter. In time the Confederate government came to them as a customer and they sold to it. By this court it was held that saltpeter is one of that class of articles which may or may not be contraband of war, and that amid the circumstances of this sale it was contraband, and the selling, aid and comfort to the rebellion. But this court never undertook to hold that the selling was a crime, a betraying, a treachery, or a breach of faith, nor ascribed to it any other consequence than such as flows from the violation of strict neutrality by a neutral in his own country. The Supreme Court, on the contrary, has held the selling to have been a crime against the laws of the United States, the claimants criminals, their offense treason, and, as a consequence, that they come within the terms of th & General proclamation of amnesty, 25th December, 1868. Their case is fortunately broad enough to cover that of every domiciled alien likely .to come before this court.
It is to be noted of Carlisle <& Henderson that the peculiarity of these cases of aliens domiciled within the insurrectionary States was not alluded to either in the argument of counsel or in the opinion of the Supreme Court, but the discussion went entirely upon the general question of the amenability of a resident alien to the law of treason, as to which I had supposed that there was not a lawyer in the world who could entertain a doubt. It is also to be noted that every authority cited by counsel or quoted by the court makes the allegiance reciprocal to the protection. Inasmuch as the case was ordered for re- *420 argument, and re-argued, and a lengthy opinion finally delivered, the only point in it may be said to have been thoroughly overlooked.
A single fact remains to be noted. The construction which this court originally gave to the term “ aid or comfort to the rebellion” in the Abandoned or captured property Act was that it referred to the fact and not to the crime, the act being in the nature of a compact and intended to x>revent material aidfrom going to the rebellion, and the fact of innocence being jurisdictional so far as actions in this court were involved. Under that construction it was a matter of indifference whether the aid and comfort were given by a citizen, an alien resident within the insurrectionary district, or a foreigner domiciled in his own country. The construction given to the statute by the Supreme Court was that the term “ aid and. comfort”related to the crime, and that the fact of guilt was not jurisdictional, but merely created a personal disability to maintain the action, which could be removed by pardon; (Padelford and Klein's Cases, 7 C. Cls. R., pp. 144, 240;) as, for example, that an innocent administrator might maintain an action for the property of a guilty intestate and for the benefit of guilty distributees. (Carroll's Case, id., p. 255.) Under that construction offenders against the statute fall into three classes: citizens, resident aliens, and foreigners. As to two of them it is now determined that these offenses, being crimes, are obliterated by the general proclamation of amnesty. As to the third, to whom no crime can be imputed, it remains to be determined whether a personal disability to maintain an action exists in the absence of crime, or whether the statute was intended to create a trust for the benefit of non-resident aliens who violated their obligations of neutrality by giving material aid and comfort to the rebellion.
The judgment of the court is that the claimant recover the proceeds in the Treasury of sixteen bales of upland cotton captured at Savannah, being $175.33 a bale, and six hundred and fifty-nine bales of sea-island cotton, being $231.79 a bale, amounting in the aggregate to $155,554.89.