Richabdson, J.,
concurring:
I concur in the opinion read by the Chief-Justice, and as I come to the same conclusion by a somewhat different course of reasoning, not presented in the argument, I will state my views.
The organic law establishing this court on its present basis and with its present jurisdiction, the Act March 3, 1863, provided “that in order to authorize the said court to render any judgment in favor of any claimant, if a citizen of the United States, it shall be set forth in the petition that the claimant and the original and every prior owner thereof, where the claim has been assigned, has at all times borne true allegiance to the Government of the United States, and, whether a citizen or not, that he has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the said. Government, which allegation may be traversed by the Government; and if on trial such issue shall be decided against the claimant his petition shall be dismissed.” (12 Stat. L., 765; Rev. Stat., §§ 1072, 1073.)
And the Abandoned or captured property Act of March 12, 1863, in section 3, giving parties the right to maintain action in this court to recover the proceeds of captured property owned by them, expressly makes the right of recovery to depend, among other things, upon the claimant’s proving in each case “that he has never given aid or comfort to the present rebellion.” (12 Stat. L., 820; Rev. Stat., § 1059, clause 4, §§ 1072, 1073.)
These two acts were passed by the same Congress, were pending therein at the same time; both passed the Senate March2, and the former passed the House on that day and the latter the day following. Both must have been before the President about *675 the same time, although the latter was signed nine days later and eight days after the expiration of that Congress, and it may be noticed in passing, as a historical fact, that it is the only instance found on record wherein the President has signed an act after the term of the Congress which passed it had come to an end.
In both acts the provisions which I have cited are substantially and practically the same. In the Abandoned or captured property Act, the requirement as to alleging and proving that the claimant had borne true allegiance, set forth in th¿ organic law, is not repeated, and the right therein given to parties to recover the proceeds of property captured is accorded to all who could prove that they had not given aid or comfort to the then present rebellion, instead of rebellion in general, as in the former act. This last difference was immaterial, because the Act March 12 was temporary and related only to mattres connected with the late rebellion, while that of March 3 was permanent and more general in its scope and provisions. The Supreme Court has decided that whatever new subjects of jurisdiction are conferred upon this court, the cases are to be heard and determined under the existing organization, and that the provisions of the Act March 3 apply to actions'brought under the Abandoned or captured property Act, even that giving a right of appeal to the Supreme Court, which is not specified in the latter act. (Zellner v. The United States, 9 Wall., 244; 7 C. Cls. R., 137.)
These two acts, thus passed at the same time, must be examined together when we come to consider the intention of Congress in enacting the provisions to which I have referred and which I have cited above.
These provisions relate exclusively to the proceedings to be had in this court, to the remedy given by statute; and it is laid down in Watlake on Private International Law, (art. 170, p. 168,) that “the laws which prescribe the modes of judicial procedure are commands, addressed not to the party, but to the judge; whence it follows that the latter is bound by those of the sovereign from whom he holds his commission, and that no circumstances can found for the parties a right to have the proceedings determined by any other will than the lex fori.” This principle of law is so familiar, that it needed no citation of authority to support ft, but, although universally acknowledged, it is so im *676 portant not to lose sight of it in the consideration of this case, that it is thus referred to in the language of an English author.
The original claimant, Alexander Collie, now repi’esented here by his assignee in bankruptcy, sets forth in his petition “that he has at all times borne true allegiance to the Government of the United States, and that he has not, in any way, voluntarily aided, abetted, or given encouragement to the rebellion against the said Government,” adopting nearly the language of the organic Act March 3, 1863, and the petition was duly sworn to by his agent as true, according to his belief, as required by the terms of said act. This, among other allegations, was traversed by the defendants, aud issue was joined thereon.
The facts found by the court conclusively show that Mr. Collie did voluntarily aid, abet, aud give encouragement to the late rebellion against the Government of the United States, systematically, continually, and extensively during nearly the whole period of hostilities, and so much was he engaged in trading with the citizens of the revolted States and furnishing them with supplies, purchasing cotton in return, and transporting the one and the other to and from the hostile territory through the blockaded ports, that, as tfie claimant’s counsel stated in bis argument, aud as may readily be inferred from the facts found by the court, his name became synonymous with ‘-,blockade-runner,” and wherever that name occurred in any matter the Government officials always knew that the transaction was connected with blockade-running.
He did more; he entered into copartnership in some of his business with one of the revolted States and with the government of the Confederate States, and shipped through the blockaded ports muntions of war, arms, gunpowder, armor-plates, cannon, shot, aud other like articles; he made presents of three guns for field-service to that government, and otherwise aided, abetted, and encouraged the rebellion in the manner set forth in the findings.
The claimant’s counsel, while conceding that the acts done by Collie were such as would require the court to dismiss his petition if he were a citizen of the United States or resident alien unpardoned, maintain that as he was a non-resident alien, a subject of Great Britain, who had never been in this country and so owed to it no allegiance, all his acts were such as he had a.right to do by the law of nations, that he committed u$ offense *677 and was liable to no punishment under the laws of the United States or G-reat Britain: and although his ease would seem to be within the strict language of the provisions of the acts which 1 have cited, it could never have been intended by Congress to exclude non-resident aliens, who had committed no crime or offense, from the privilege of bringing actions in this court for doing what by the law of nations they had a perfect right to do. And they seek to have the provisions referred to so construed as to include only such unlawful aid, comfort, and encouragement to rebellion as would amount to crimes and offenses puuishable under the laws of one country or the other. The case, then, turns upon the intention of Congress as expressed in these provisions.
We have listened to able, learned, exhaustive, and instructive arguments by the distinguished counsel who have presented the claimant’s case with great power, industry, and ingenuity to prove that the acts of Collie were not crimes or offenses, and were not forbidden by the rules of modern warfare nor by the law of nations.
If the acts of March, 1863, had beén passed in time of profound peace, aud Congress were then engaged in making comprehensive provisions for the determination and settlement of claims against the United States by aliens and others, or were enacting a code of punishments, penalties, and forfeitures for offenses against the State in time of war, the arguments, citar tions, and illustrations by claimant’s counsel would have a powerful application, and I cannot say that they would not conclusively prove the correctness of the position which has been taken by them.
But in passing the Act March 3, and in enacting the provisions in the Act March 12, 1863, authorizing suits to be brought in this court to recover the proceeds of captured and abandoned property paid into the public Treasury, Congress was dealing with privileges to be granted, and not with crimes and offenses to be punished. To allow suits to be brought and judgments obtained against the Government in any form, to any extent whatever, and by any parties, as a matter of right, was then an untried and novel undertaking.
Until the year 1855, no provisions had ever been made since .> the adoption of the Constitution for the investigation of claims against'the United States outside of Congress and the Depart *678 ments. This court was then established with extremely limited powers. Parries might petition the court and have their claims examined and reported upon to Congress for its action thereon, and that was the extent of the privileges conferred by the Act February 24, 1855. (10 Stat. L., 612.)
That a State cannot be sued without its consent is a well-established'principle. In the case of De Groot v. The United States, (7 C. Cls. R., 2, 5 Wall., 431,) Mr. Justice Miller thus refers to that subject in connection with this court:
“The Government of the United States cannot be sued for a claim or demand against it without its conseut. This rule is carried so far by this court that it has been held that when the United States is plaintiff in one of the Federal courts, and the defendant has pleaded a set-off which the acts of Congress have authorized him to rely on, no judgment can be rendered against the Government, although it may be judicially ascertained that on striking a balance of just demands the Government is indebted to the defendant in an ascertained amount. And if the United States shall sue an individual in any of her courts, and fail to establish a claim, no judgment can be rendered for the costs expended by the defendant iu his defense. If, therefore, the Court of Claims has the right to entertain jurisdiction of eases in which the United States is defendant, and, to render judgment against the defendant, it is only by virtue of acts of Congress granting such jurisdiction, and it is limited precisely to such cases, both in regard to parties and to the cause of action, as Congress has prescribed.” ,
And in Ex parte Russell, (7 C. Cls. R., 268, 13 Wall., 668,) Mr. Justice Bradley says: ’‘The erection of the Court of Claims itself, and the giving to parties the privilege of suing the Government therein, though dictated by a sense of justice and good faith, were purely voluntary on the part of Congress; and it has the right to impose conditions and regulations iu reference to the proceedings in that court as it sees fit.”
By the two acts of March, 1863, Congress did grant its consent to have judgmeut rendered against it in this court, and, in language which seems clear enough when taken by itself, did describe the parties upon whom it conferred its privileges. If it did not mean what the full force of the'words imply, but intended to exclude from the privileges only those who had so aided the rebellion as to have committed crimes or offenses *679 thereby, and did intend to grant the privilege of maintaining actions in this court to non-resident aliens, who, although they may have done 'the acts described, had committed no offense against the law of nations, that intention must be gathered from the acts themselves, read and construed by the light of the times and circumstances in which they were passed, the prevailing sentiment of Congress and of the country, as well .as the then existing condition and progress of that great rebellion, in the midst of which, with the future'all uncertain, the nation was struggling for self-preservation, and the efforts on the one side to suppress and on the other to maintain it. By such light only can we read the intention of Congress as expressed in its well-chosen words.
In the winter of 1862-’63, when Congress was considering the matters incorporated into the acts of March, 1863, the internal resources of the .seceded States had become greatly exhausted, and the hope of holding out until'the Union cause should be abandoned, and of the final success and triumph of their own cause, rested to a great extent, if not mainly, as perhaps it had from the beginning, upon their foreign commerce, by which their cotton, their principal reliance for obtaining means to carry on the war, was sent to market, through merchants at home and abroad, and supplies for their armies and their people procured in return. Emissaries and agents were dispatched to foreign countries, and «specially to England, to forward that object. The extensive commercial house of Trenholm & Go., of Charleston, S. 0., had established a branch house at Liverpool, and one of their members became a naturalized citizen of Great Britain, and Trenholm was made secretary of the treasury •of the Confederacy. This house in Liverpool was a depositary of the public money of the rebel organization, and through it, in the apt language of the presentation of the case of the United States before the Geneva commissioners, “There was early festab-lished in Great Britain a branch of the war department of the insurgents, a branch of their navy department, and a branch of their treasury, each with almost plenary powers.” By means •of foreign commerce and foreign loans this branch of their treasury was supplied with funds. Contracts were entered into in England for building steamers for the Confederate States,' .six iron-clads having been contracted for there in August, 1862, and other vessels were built for the insurgents at other times *680 and places. Blockade-running by the subjects of Great Britain was encouraged and promoted, and a large commerce sprang up between England and the rebel States, carried on, to a great extent, by transshipments at Nassau, Bermuda, and other British ports, by means of which the power of the rebellion was increased, and the ability of the insurgents to carry on war was enlarged.
In August, 1862, there was established iu London a “ Confederate States Aid Association,” whose object was to appropriate all money received toward “purchasingand forwarding to the Confederate States of America the materials which, in the judgment of the association, shall be considered the best calculated to enable them to carry on the war, and to bring their present protracted struggle to a successful issue.” (Diplomatic Correspondence, 1863, Part 1, 19.)
In December, 1862, Mr. Adams, our minister to the court of Saint James, in one of his dispatches to the Secretary of State, after referring to the appearance of a softening in the tone of public sentiment toward the United States, adds:
“ The great obstacle in the way of the better understanding which would naturally follow from this state of things is to be found in the movements going on in this kingdom, under strong appeals making to the avarice of the commercial interest by the desperate insurgents. There is scarcely a limit to the extent of the offers to secure assistance. Much of the evidence upon which I make this statement has already beeu laid before you from other quarters. It appears that a loan, to a large amount, has been effected on the security of cotton, to be furnished at a price which would secure an enormous profit to the holders, and that a corresponding rate of gain has been held out for the delivery of goods, of which the rebels now stand in the most absolute need. This discovery furnishes at last an explanation of the sources of the large sums of money which have beeu lavished at a most reckless rate in the purchase and construction of steamers of all kinds and munitions of war, in the dispatch of military adventurers from the continent, and in the purchase of every variety of article that.is needed to supply existing domestic wants in those States. The ports of Liverpool and London are filled with vessels taking in commodities destined for the insurgents. At the same time, a strong interest is thus formed which must be brought to bear more or less forcibly on the pol *681 icy of the government toward the United States.”. (Diplomatic Correspondence, 1863, Part 1,15.)
The efforts of the United States Government were pat forth in every possible direction within its power to cripple, curtail, or stop this material aid and comfort which the insurgents were receiving from abroad, and especially from England. The ports of the rebel States were blockaded, as far as the magnitude of the undertaking would admit, remonstrances were made'to the British government, and nothing was omitted to be done in that direction that could be made available for the purpose. Public feeling was excited, and it was at that time by no meaus certain that the foreign relations of the United States, through the very transactions in which the claimant was taking an active and important part, might not involve the country in a war with one or more of the foreign powers before the rebellion could be suppressed. It is not necessary to go further- into the history of those days, when the Union was in the midst of a great struggle to preserve its existence.
These events have thus been referred to to a very limited extent merely for the purpose of recalling to mind, in discussing the questions now under consideration, the sentiment which was prominent and, next to maintaining the armies in the field, predominant in Congress when the acts of March, 1863, were passed. Those events are of too recent date, and have been too extensively discussed in diplomatic correspondence, in Congress, and in the public press, to require more than a passing mention. They were then, and are still, as familiar almost as household words.
It will be seen and remembered, I think, that Congress was not in a condition of sentiment or disposition to accord to nonresident aliens who were engaged in giving aid, comfort, and encouragement to the rebellion any rights not guaranteed to them by the law of nations, nor to grant to them any new privileges from which it excluded our own citizens for doing the same kind of acts.
In my opinion, it vi^as the well-considered and well-understood intention, as it was the clearly expressed language and the undoubted right of Congress, not to confer the privilege of maintaining actions in this court upon unfriendly non-resident foreigners engaged in blockade-running, in building vessels for the rebel government, in furnishing money and means, by loan or other *682 wise, and generally in aiding, with material assistance, the insurgents to- continue active hostilities against the Uuited States and to prolong the rebellion, which had even then reached a great magnitude, endangered the Union, and subjected the country to immense losses iu human life and treasure.
And this was not because Congress desired or intended to confiscate any property of non-resident aliens, or to deny to them any reasonable and just rights and privileges, or to discriminate against them in an unfriendly spirit, but because the matters involved were connected with important diplomatic questions and with principles of international law'affecting our foreign relations, which-Congress was not at that time prepared to submit in whole or in part, directly or indirectly, to the determination of this or any other court of law, but which it chose to reserve for future arrangement and settlement in the usual manner, by treaty stipulations, which might at the same time cover all the controversies growing out of the then existing rebellion which had unhappily sprung up between this country and the European nation principally concerned therein, as it left the case of citizens and those owing allegiance, who had given aid and comfort to the enemy, to the future consideration and determination of the President, in the exercise of his constitutional power of pardon.
And most magnanimously and honorably have those powers been exercised since the termination of the rebellion; as to citizens, by the proclamation of pardon and amnesty, (15 Stat., h. 711,) and as to non-resident alieus, subjects of Great Britain, by the great treaty of Washington, entered into arid established as the basis of settlement of all the numerous controversies between the high contracting parties, (17 Stat. L., m63,) a treaty which will forever stand as a monument of the peaceful settlement of international controversies by arbitration to an extent never before attempted, reflecting credit upou both nations'as well as on all parties eugaged iu originating, framing, and executing it.
This treaty provided, in Article XIf, (lo Stat. L., 867,)'for the settlement of just such claims as that óf the present claimant, and he presented his case to the commissioners appointed under that article. By them his petition was dismissed because he had brought his action in this court and submitted the same claim to the jurisdiction of this tribunal, and it has been suggested as a hardship that he should be turned away from each *683 tribunal on tbe ground that the other alone had jurisdiction of the case. I think the facts do not warrant the suggestion. Mr. Collie, at the close of the rebellion, when his occupation was gone, instead of waiting, as did others in like circumstances, for the Government of his own country to which he owed allegiance to enter into treaty arrangements for the settlement of such cases, made haste to avail himself of the limited privileges accorded by thejurisdiction of this court, and presented his case here with such allegations, under oath, as clearly brought him within the terms of that jurisdiction. Because he had submitted his claim to this court, the commissioners, under the twelfth article of the treaty, held him to his election and refused to take tbe case away from that tribunal of his first choice, (Robert S. Hale’s Report to Secretary of State, 47, 207 ;) and this court now dismisses his petition, not for want of jurisdiction, but because the issue is fouud against him on the facts- alleged by himself. Had he proved here the allegations of his petition he would have a good cause of action and would be entitled to judgment in his favor, and if he relied upon proving facts which his evidence would not support, this was his own fault or his misfortune.
I have said that Congress was not willing at the time of the passage of the Act March 3, 1863, to submit controversies and ■questions of international law in general to the determination of this or any other court of law, and that is apparent from the ninth section of the act, (now Rev. Stat., § 1066,) wherein it is provided “ that tbe jurisdiction of said court'shall not extend to or include any claim against the Government not pending in said court on the first day of December, 1862, growing out of or dependent on any treaty stipulation.entered into with foreign nations or with Indian tribes.” The settlement of that class of cases, as of this to which the claimant’s case belongs, Congress reserved for the diplomatic branch of the Government.
The claimant’s counsel rely much upon the decision and opinion of the Supreme Court in the case of Murry v. Schooner Charming Betsey, (2 Cranch, 64,) in which Chief-Justice Marshall recognized as a correct principle “that an act of Congress ought never to be coustrued to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.”
*684 That case arose under the Act February 27, 1800, (2 Stat. L., 7,) "to suspend the commercial intercourse between the United States and France and the dependencies thereof,” and was for the condemnation of the schooner captured as a prize for violation of that act. The owner set up that he was a Danish subject and not a citizen of the United States, and claimed the protection due to him by the law of nations. It appeared that said owner, although born in the United States, had removed to the island of Saint Thomas while an infant; that he carried on trade, married a wife, and acquired real property on the island, and had taken the oath of allegiance to the crown of Denmark. The c“ourt held that he had made himself the subject of a foreign power, put himself out of the protection of the United States, and was not a citizen within the meaning of the act so as to subject his schooner to capture as a jjrize for violation of its provision.
But in the case now under consideration the present claimant does not set up any rights to which he is entitled by the law of nations; and the acts of March, 1863, construed as I interpret them, violate neither that law nor the rights of neutrals, nor interfere with nor affect neutral commerce in any particular. It was strictly within the right, as it was within the power, of Congress to grant or withhold the privilege of suing in any of the courts of its own creation to and from such persons and for such causes of action and upon such allegations and proofs as, in its wisdom, it saw fit to prescribe.
The claimant, instead of demanding rights under international law, comes here seeking privileges under the local laws of that country whose Government, policy, and efforts at self-preservation in time of peril, the facts show he did his utmost to cripple, injure, and destroy, and by that law his case must be tried and determined.
It has been strenuously maintained that there is a distinction, in the same case and as to the same party, in fact and in law, between the crime or offense and the act of aiding, abetting, and giving comfort or encouragement to rebelli <- which the Supreme Court has recognized, (Bond’s Case, 2 C. Cls. R.., 529; Pargoud’s Case, 4 id., 337; Witkowski’s Case, 7 id., 398; Green’s Case, 8 id., 420; Collie’s Case, 9 id., 431;) and that it having been decided by that court that pardon relieves citizens and subjects, including resident aliens owing a temporary alie- *685 giance to the Government, from the disabilities imposed by the words to which I have referred to maintain actions in this court, (Klein’s Case, 7 C. Cls. R., 240, 13 Wall., 128; Armstrong’s Case, ib., 280, 13 Wall., 154; Carlisle’s Case, 8 id., 153, 16 Wall., 147; Pargoud’s Case, 7 C. Cls. R., 289; see also Ex parte Garland, 4 Wall., 333,) aud as pardon can afford relief only in cases of crimes and offenses, therefore it necessarily follows that-it was the crime or offense only of aiding and giving comfort to the rebellion that was referred to by Congress, and that it still farther follows that, as non-resident aliens cannot commit the crime or offense of treason against this Government, therefore they are not included within the class of persons to whom the words in question apply. It was upon this ground that the claimant recovered judgment in his favor upon h former trial of this case. (9 C. Cls. R., 431.)
I do not concur in the proposition that any such distinction between the act and the crime, when the act constitutes a crime, was intended by Congress in its statutes referred to, or exists in law; and, in m,v opinion, it is not supported by the decisions of the Supreme Court which have been relied od, nor by any language used by the judges in their opinions, and is not warranted by the words employed, as construed by the ordinary rules of construction or interpreted by the light of the times in which they were introduced into the statutes, as I have before pointed out, and therefore I cannot concur in the deductions and conclusions which have been drawn therefrom by counsel and others.
In my view it was because the Supreme Court found that there was no distinction between the act and the offense in the case of citizens and persons owing allegiance, temporary or otherwise, that it was held that pardon removed the disability. The words “aid aud comfort” aud “aided, abetted, or given encouragement” to rebellion, when applied to such persons, as clearly aud accurately describe a crime or offense as if the word “ treason ” had been used. The act is the offense. They are one aud inseparable, the same in law and in fact, and I think were so regarded by the Supreme Court when it was decided that when the crime was pardoned everything done, within any meaning of the words in question, was also pardoned, and all disabilities arising therefrom were blotted out.
Treason is defined by the Constitution to “ consist of levying *686 war agaiust them [the United States] or in adhering to their enemies, giving them aid-or comfort,” and Congress is invested with the power to declare the punishment of treason, under certain limitations, (Constitution, Art. 3, § 3.) To the President is-given the power of pardon, (Constitution, Art. 2, § 2,) and that power is commensurate with the right in Congress to declare-punishments. By whatever words Congress describes treason or any other offense, and attaches thereto a punishment, in whatever form, either by imprisonment or fine, by political disabilities or civil disabilities of extensive application, or simply by disabilities to sue in this or any other court, the President’s power of pardou extends to and reaches it, and by his constitutional prerogative he may remove the same in any case according to his own will and pleasure,' and that prerogative cannot be avoided by any attempt to make a distinction- where none exists-in law, and to attach disabilities to the act and not to the offense. (Klein's Case,* 13 Wall., 128.)
Congress thus having attached to the act of aiding, abetting,, or giving encouragement to rebellion a disability to maintain actions in this court, that disability, whenever it applies to a person owing allegiance to the Government, may be pardoned by the President, and such pardon obliterates the whole penalty,, whether for the act or the crime, for they cannot be separated. Congress in describing the act described the crime, and the President in pardoning the crime pardons all the legal consequences of the acts which constitute the crime.
Such, in my opinion, is the true meaning, force, and effect of the decisions of the Supreme Court.
To every human act consequences .are attached by the laws of nature which no executive pardon can reach and which no human power can obliterate, while to the same act the laws of man may decree other consequences, which, except where already accomplished, the power creating may destroy, obliterate, modify, and prevent, by pardon or otherwise; and in that sense, and no other, according to my view, can a distinction be drawn, as is attempted, between the act and the crime, when the act constitutes a crime.
When Congress created the disability in question as to per-, sons who.gave “aid and comfort to the rebellion,” or who had “voluntarily aided, abetted, or given encouragement to rebel *687 lion against the said Government,” it intended, in*my opinion, to use those words in their usual, natural, and x>lain signification, without exception and without the subtle distinction invented by the ingenuity of learned counsel, by which they would apply to the offense as distinguished from the act, aud that Congress did this with a full and clear understanding that parties could have such disability removed or modified, each according to his legal status, the citizen and resident alien by pardon, and the non-resident alien through his own government by treaty stipulations or diplomatic negotiations.
It seems tome tha t ongress introduced the words in the Act March 3, “ if a citizen,” of whom it was required that he should prove that he had “at all times borne true allegiance to the Government of the United States,” and the words “ whether a citizen or not” in the subsequent provision requiring such person to prove that “ he has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the said Government,” and carefully omitted the word “ treason ” from that act and the Abandoned or captured property Act for the very purpose of making sure, by words whose meaning could not be mistaken, of reaching persons whose acts would not be crimes punishable under any law whatever.
Disabilities to maintain actions in courts of law not arising from crimes or offenses are familiar to every lawyer. (Rev. Stat., § 1069.) Those aliens who are citizens or subjects of a government which accords to citizens of the United States the right to prosecute claims against such government in its own courts are the only aliens who, under any circumstances, have the privilege of prosecuting claims in this court. (Rev. Stat., § 1068; The United States v. O'Keefe, * 11 Wall., 178.)
To exclude parties from the privilege of bringing actions in the courts of a State by reason of, and in matters connected with, acts done by them in other States, not in violation of any law to which they are amenable criminally, but which the State wherein-such courts are established deems injurious to its interests and against its determined policy, and which would be offenses if done in that State, is no novel proceeding, and has never been deemed a breach of that comity due from one State to another. Massachusetts long ago provided that “ no action *688 of any kind shall be had or maintained in any court for the price of any liquor sold in any other State for the purpose of being brought into this Commonwealth to be kept or sold in violation of law under such circumstances that, the vendor would have reasonable cause to believe the purchaser entertained such illegal purpose.” (General Statutes of Mass., ch. 86, § 61.)
Maine enacted a similar law. (R. S. of Maine, p. 309, § 50; Meservey's Case, 55 Maine, 540.)
Even independently of statute prohibitions the courts of a State do not afford remedies to parties engaged in other States and countries in transactions legally carried on there with the intention and for the purpose of assisting in the violation of laws of the State in which the aid of the courts is invoked. (Webster v. Menger, 8 Gray, 587; Territt v. Bartlett, 21 Vermont, 184.) And I apprehend that, by the common law, no action could be maintained in this country for freight earned by neutral vessels in the transportation and delivery of goods to persons in the rebel States through the blockaded ports during the rebellion, under whatever flag and from whatever country such vessels sailed, nor for the price of goods so delivered. (Story on Conflict of Laws, § 259'N) These cases, I know, differ from this one now at bar, because Congress may authorize actions to be brought against individuals or against the Government in whatever cases it sees fit to grant the privilege; and we are now dealing with statute law, and the question here is whether or not the privilege has been granted to the claimant to maintain-this action under the statute which this court is administering. But they go far to show that to exclude aliens or nonresidents from our courts for engaging in transactions in other countries against the laws, contrary to the policy and detrimental to the safety and well-being of this country, especially in matters growing out of those very transactions, and in suits against the State itself, is no breach of international law or the comity of nations.
That the word “ citizen,” in the Act March 3, 1863, was intended to include resideut aliens is no longer an open question. We know that in popular language it is not always restricted in meaning to a subject of the nation owing full allegiance; and in Field v. Adren, (7 Md., 209,) it was held that “ a party may not be a citizen for political purposes, and yet may be a citizen for commercial or business purposes.” And Huberus lays it down as an axiom, that “ all persons found within the limits of *689 a government, whether their residence is permanent or temporary, are to be deemed subjects thereof,” (Huberus, lib. 1, 'tit. 3, de conflictu leguni, 538, § 2; Story on Conflict of Laws, §§ 29, 541;) and in the same sense that they are subjects they are also citizens.
The Supreme Court has authoritatively decided that resident aliens in the territory of the insurgents committed an offense by giving aid and comfort to the rebellion, which could be pardoned by the President, and this could be so only by reason of their being in a restricted sense subjects and citizens. (Carlisle & Henderson's Case,* 16 Wall., 147.)
That decision confirms my opinion that the Supreme Court did not recognize the distinction attempted to be maintained between the act and the crime, when the act constitutes the crime, nor hold that Congress intended to refer to the latter and not; to the former in denying the privileges of this court to certain parties for acts done by them, because if that had been the view of the judges they could much more readily and easily have disposed of Carlisle’s case, since the statute thus construed, if the claimants had committed n,o offense, did not apply to them, and if they had committed an offense the President’s pardon relieved them therefrom, and there would have been nothing in the case which required the learned opinion which was delivered, devoted, as it is, to showing that the claimants, resident aliens, committed an offense by giving aid and comfort to the rebellion, which was pardonable and pardoned, and for that reason that they were not barred from a right to recover judgement in this court. The implication is strong and clear that if the acts of aid and comfort given in their case had been held not to constitute an offense, by reason of the alienage of the claimants, judgment would have been rendered against them, and, that could have been only upon the ground that the statute of disability referred to the acts of giving aid and comfort to rebellion whether constituting an offense or not.
In the views which I have taken of the subject here discussed, the opinions of the Supreme Court are clear,- consistent, and harmonious, and unmistakably indicate the rules which ought to govern in the decision of the present case.
For these reasons I concur in the judgment dismissing the claimant’s petition.
*690 Nott, J.,
delivered the following opinion :
The masterly arguments of the counsel for the claimant— arguments which, so far as my personal experience goes, have never been surpassed in this court in power and legal analysis and comprehensive learning — placed the right of the claimant to recover here upon his rights as a neutral subject standing upon the general principles of international law. I am aware that justice cannot be done to the legal positions of the argument when reducing them to a-single sentence, yet, for the purposes of this inquiry, I shall endeavor to state them as accurately as may be in the following propositions:
The right of the claimant as a foreign neutral to acquire this property, and the right of the United States to appropriate it by capture or confiscation, are questions of public and not of municipal law ; the purpose of the statute was to make all claims upon the fund a subject for judicial and not for diplomatic redress; and when the Government furnishes a judicial tribunal for claims growing out of its belligerent acts, the subject of another Government must exhaust the remedy thus afforded before he can ask the interposition of his own sovereign; and hence this statute becomes a matter of public law, and the case is to be adjudicated by the courts of the United States precisely as it would be by the courts of another country, the law to be administered being, in the words of Lord Stowell, “universal,” “ and the seat of judicial authority locally here.” (The Maria. 1 Rob. Ad. R, 350.)
This last proposition, I deem to be the key of the entire case; if the law to be administered here is to be administered precisely as it would be by the courts of another country, I am fully convinced that the claimant is entitled to judgment.
But let it be borne in mind that in the late civil war the United States possessed the dual character of a belligerent conceding belligerent rights, and of a sovereign striving to establish its own authority in its own insurgent territory, jealously reserving the right to punish the offenses against its sovereignty by penalties, forfeitures, and confiscations whenever its authority should be re-established, and publicly proclaiming its intent so to do by statutes and proclamations and in every conceivable manner. Let it also be borne in mind that this property of the claimant, lawfully purchased, as he asserts, was never carried *691 through the blockade to neutral territory, but was allowed voluntarily, after purchase from insurgent citizens of the United States, to remain on American territory until the authority of the United States was re-established by force of arms.
Conceding that in a civil war a neutral may trade with either, that he may buy and carry away property which will be liable only to the risks of capture in passing through a blockade, does it follow that a neutral may come upon iusurgent territory and buy property liable to confiscation and evade the risks of carrying it away by leaving it in the insurgent territory until the termination of hostilities, and then set up his own title thus acquired, and insist as a neutral that, having had the right to trade by the law of nations, all property so acquired must remain exempt from forfeiture by operation of the municipal law after the municipal law has been re-established by the de jure government? Conceding that if a neutral bought and carried his purchase to neutral territory the legality of his title could not be questioned in the courts of the United States on the ground that it was acquired against their municipal law or their public policy, does it follow that a neutral could have goneinto our insurrectionary districts and bought property, real or personal, (liable in the hands of the vendor to ultimate confiscation,) and after its capture on land, or seizure for forfeiture at the termination of hostilities, that he could have come in through his own government and set up his title as neutral to defeat the lawful government’s right of confiscation? In a word, could non-resident aliens, owing no allegiance to this Government, by simply passiug through the blockade, have put themselves in a position where they could, have bought, without limit, property of the insurgents which the United States would otherwise have been authorized to capture or confiscate, but whieh they would be debarred from capturing or confiscating without compensation in the hands of a neutral who thus acquired it, because on well-settled principles of international law neutrals may trade with belligerents ? And if the United States had seized such property so acquired, by civil process, as they have here done by force of arms, would the government of the neutral be warranted in interposing and insisting on compensation for the property thus seized and forfeited f
In the cases of ordinary belligerency, where two independent nations are carrying on hostilities, it is manifestly immaterial *692 whether property acquired through the blockade of the one be left on the territory of the. other, or carried to neutral territory; for, when peace returns, the purchaser will stand on'the same friendly territory that he stood upon when he acquired his title. But, in the case of civil wars, there is always behind the matter of neutrals’ right of traffic the offended majesty of the de jure government. No nation that I am aware of has ever conceded to aliens, in time of war or in time of peace, the right to evade its laws or civil policy, and no nation, I apprehend, consistently with the preservation of its own' integrity, can ever coucede to neutral powers its liability in such a case, or even surrender such liability to arbitration. The rule in cases of civil war, which will concede to neutrals their rights of belligerent traffic, and to governments their right of maintaining the integrity.of their nationality, will be found, I apprehend, to be this : If the property acquired through the blockade of the government de jure be carried successfully to neutral territory, it will cease to be delinquent, and the alien’s title thereto will be upheld in all courts, including those of the de jure government; but if, on the contrary, the property be left upon insurgent territory until the restoration of that government’s authority, it will be subject to its disposal to the same extent as the like property of its insurgent citizens, and may be administered according to the provisions of its municipal law.
I am therefore of the opinion that this court must deal with this case in its ordinary character of a court of the United States administering municipal law, as distinct from the assumed character of a prize court or international tribunal administering public law. In accordance with this conclusion, I now pro.ceed to examine the only matter which in my opinion can afford a ground of defense to the present suit.
. On the former trial of this case, I expressed the opinion that, apart from the terms of the statute, and apart from the aid or comfort given by the claimant to the rebellion, the title to this cotton having been acquired by a non-resident alien in a blockaded port against public policy, the claimant was in the plight of a smuggler; and that the forbidden traffic having failed to reach a result, courts, of the United States would not aid him to obtain the proceeds of property acquired against the declared and well-understood public policy of the United States, (9 0. Cls. R., 455.) At that time the subject was a new one, which *693 bad nob been presented by the counsel for the Government; and two doubts arose in my mind respecting the applicability of the doctrine to the case. The rule in such cases is well settled that where the party has acquired the fruit of his forbidden traffic the courts of the country will not disturb him in his possession; and it was certainly a question where chattels personal had been bought and reduced to possession whether the eyes of the court would be open to see the illegal title by which they were acquired. But the Supreme Court subsequently, in Sporott's Case, (10 C. Cls. R., 1,) resolved this doubt by deciding in favor of the applicability of the doctrine, and still more pointedly in Whitfield's Case (11 C. Cls. R., 460) said that the courts of the United States will not assist a claimant to “enforce a right growing out of a contract” “ tainted with the vice of the rebellion.”
A second doubt has been revived by the able argument on the present trial concerning the rights and liabilities of neutrals, though not directed to the point now under consideration. It may be thought that the only effects of belligerent acts by a neutral are belligerent effects, and that the municipal law of the offended belligerent knows them not. And this is undoubtedly true so far as the person of the neutral is concerned. The municipal law cannot punish him. When the war ends he resumes all the international rights which he ever possessed, and is entitled to all the privileges and remedies which the municipal law or international comity or-treaty stipulations accord to those of his fellow-subjects who never violated the strictest obligations of neutrality. As was said by a late eminent and now lamented lawyer* in his argument in the case of Carlisle & Henderson (8 C. Cls. R., 156) in the Supreme Court, “Peace is amnesty as to aliens.” A question therefore fairly arises whether the public policy of a country which its courts enforce against aliens exterritorially innocent of violating its municipal law embraces a belligerent policy of a past war, or whether such a policy dies with the war and becomes au exception to the general rule.
Therefore, since the argument, ! have given a careful, though brief, examination to the subject, and am satisfied, though I confess there is a singular dearth of authorities directly upon the *694 point in the reports, that the war policy of a country, when properly declared by statutes and formal proclamations, is equally to be maintained by courts.
The maxim is, Ex turpi causa non oritur actio, and the principle is that the courts of a country will not aid a foreigner to accomplish that which the laws or policy of the country forbid to its own citizens. No nation is bound to recognize a contract which is injurious to its own interest. (Story, Conft. Laws, § 244.) And “the laws of every State affect and bind directly all property, whether real or personal, within its territory,” “and also all contracts made and acts done within it,” (id., § 18,) and every nation has an exclusive right to regulate things within its own territory according to its own public policy. (id., § 22.) Contracts which are in evasion of the laws of a country, or of the duties of its citizens, which are against public right or opposed to national policy, are to be deemed nullities in the country affected by these considerations, (id., §244.)
These general principles make no exception of the kind or nature of the policy which is to be respected or upheld by the courts of the country. Nor is it necessary that it should be a policy declared by positive law. .Statutes and proclamations are in this regard only indicative of national policy, and courts (as in Sprott’s Case) will declare and maintain a public policy, though there be no express statute covering an exceptional transaction. With regard to the war policy of a nation, the clearest declaration of it which I have been able to find is in a very learned and able, though little used, book, (1 Bell’s Commentaries on Laws Scotland, p. 31.) and is in these words:
“ Contracts against war policy. — The general principle which regulates this department of law is that war is the operation of the governing powers of the state, aiming at the attainment of national good or the avoidance of national evil; and by the infliction of such inconvenience and distress on the enemy as may induce them to grant the terms of peace for which it is thought expedient to insist. It implies that individuals (who are necessarily without the information which directs the policy of the state) shall not be permitted to interfere. And the rule is that there is not a war for arms and a peace for commerce. It is a necessary consequence of this, that no contract entered into against the war policy can receive effect in a court of law.”
Notwithstanding the notable rarity of cases where courts have *695 asserted a war policy after a war has passed, there is one decision which I think directly in point, and invested with decisive authority in being a decision of the Supreme Court. The case is all the more authoritative as involving au exceedingly rigorous application of the war policy against an alien plaintiff who personally was innocent of an attempt to violate it; and the application, moreover, was against all moral considerations, and unhappily favorable to a party who on neither moral nor equitable grounds was entitled to favor or assistance from a court. This case is Hannay v. Eve, (3 Cr. R., 242,) and the facts were these:
During the war of the Revolution, Congress, by their Resolve 9th December, 1781, declared, in retaliation, that all British vessels which should be seized by their crews and brought into an American port “should be deemed and adjudged as lawful prize to the captors.” A British vessel bound to New York (then in possession of the King’s forces) being unable to make that port and in danger of foundering, the captain proposed to the crew that they should seize and carry her into au American port, it being first agreed between them that a large proportion of the prize-money should be awarded to him for the beuefit of the owners. This plan was carried through, the crew standing fast by their agreement, and the captain receiving a large proportion of the prize-money which would not otherwise have been awarded to him. After the war, the owners came to this country and filed a bill against the captain to compel restitution of the money so received. The case came to the Supreme Court, and Chief-Justice Marshall said of it: “The agreement to save the ship and cargo under the semblance of a condemnation was not an immoral act; it was, as has been truly said, a stratagem which the laws of war would authorize; bat it was certainly a fraud upon the resolution of Congress, and no principle can be more clear than that the courts of the United States can furnish no aid in giving efficacy to it.” * * * “It has been thought by some of the judges that, the contract being in itself compatible with the strictest rules of morality, and being opposed by only a temporary and war regulation which exists no longer, may now be enforced. But upon more mature consideration, the majority of the judges accede to the opinion that the contract being clearly in fraud of the law as existing at the time,” “its execution cannot be compelled by the courts of that country to evade whose laws it was made.”
*696 Being satisfied on reason and authority that the war policy of a government should be respected and upheld by the courts of a country, even after the war has ended, I pass to the inquiry whether this war policy of our Government can be asserted against this claimant and concerning the present cause of action.
It has been said that in the case of a civil war an alien, residing in. his own neutral territory, may trade with insurgents who have been recognized as belligerents, and that, by a universal rule of public law, which has often been recognized and maintained by the United States, such traffic is lawful and to be upheld. Let it be conceded that such is the fact and the rule, and that the. courts of the United States cannot in good conscience deny the prosecution of this right which they would accord to one of our citizens were the parties aud conditions of the case reversed. Let it be conceded that all exterritorial transactions are to be maintained in our courts though their purpose and effect were to injure the Government and prolong the rebellion. Let it be conceded that if a citizen of the United States had gone from Bichraond to Liverpool, aud there bought arms' for the use of the Confederate troops, that fact appearing on the face of the contract, and he adding to it his personal guaranty, a suit might be maintained upon it in our courts, and no denial upon the ground of public policy be assorted. The question still remains whether the claimant’s purchases of cotton on insurgent territory during the war were exterritorial. “The laws of every state,” says Story, (supra,) and I may add, the public policy of every state, “ affect and bind directly all property, whether real or personal, within its territory,” “ and also all contracts made aud acts done within it.” The laws and public policy of the United States may not have extended to the person of the claimant; did they attach to these transactions and to this property ? In a word, were purchases by a non-resident alien within our insurgent territory, while it was held by the de facto government of the Confederate States— were they, so far as our laws aud public policy were involved, exterritorial ?
Before the decision of the Supreme Court in the case of Carlisle & Henderson (8 C. Cls. R., 153) I had been inclined to hold, with regard to aliens domiciled or temporarily residing in our insurrectionary district, that he who did nothing to violate the laws of the United States so long as they were paramount could *697 not be lield to violate them after they had been, for the time, superseded by the laws of a government de facto. My impression, indeed, was that an alien owing a temporary allegiance to a government de facto, which affords him protection, cannot be held at the same time to owe a constructive local allegiance to a distant government de jure which affords him no protection. After foreign governments had recognized in the Confederacy a belligerent power I had supposed that they would not consent to their subjects in the South being held amenable to the laws of the United States until those laws were re-established by force of arms. I have since examined (Green's Case, 8 C. Cls. R., 412) every authority cited on the argument and in the decision of Carlisle & Henderson and find that they all treat the local allegiance which an alien temporarily owes to the government under which he voluntarily came as reciprocal for the protection which it affords to him. They hold, substantially, as set forth in the words of East, (Crown Law, chap, ii, § 4,) that. “ the local allegiance ” “ which is due from a foreigner “ is founded in the protection he enjoys for his own person, his family and effects, during the time of that residence.” Nevertheless the doubts which I entertained as to the existence of the rule where the reason of the rule had ceased do not prevent me from recognizing the conclusive character of that decision.
Its significance will be best gathered from its facts, which, as condensed in a former statement, (8 C. Cls. R., 419,) were these : Two Englishmen, resident within the insurrectionary States, were engaged in the manufacture of saltpeter there. They did nothing to bring about the rebellion, nor in any way violated the municipal law of the United States. After the authority of the United States had ceased to be paramount they did not take up arms or commit any overt act of hostility, but continued their business of making and selling saltpeter. In time the Confederate government came to them as a customer and they sold to it. By this court it was held that saltpeter is one of that class of articles which may or may not be contraband of war, and that amid the circumstances of this sale it was contraband, and the selling, as a matter of fact, aid and comfort to the rebellion. But this court never undertook to hold that the selling was a crime, a betraying, a treachery, or a breach of faith. The Supreme Court, on the contrary, held the selling to have been *698 a crime against the laws of the United States, the claimants criminals, their offense treason, and that the territorial authority of the United States continued within the Confederate military lines, where the aliens were, so completely that the mere sale of this contraband article to the Confederate government, with knowledge that it was to be used for the prosecution of the war, made them “ participators in the treason of the Confederates equally as if they had been original conspirators with them.” That is to say, the Supreme Court determined, as I understand the decision, that the authority of the United States continued territorially throughout the rebellion as it existed before the rebellion, and that it attached to persons, property, and transactions, to citizens and to aliens, so completely that nothing which took place on Confederate soil can ever claim the immunity of being exterritorial.
I am, therefore, constrained to hold that when the claimant, in the person of his agent, entered the port of Savannah, he entered the territory of the United States, and left behind him his character of a foreign neutral; and that the property which forms the subject of the present suit was then and ever has been within the territory of the United States, subject to all the restrictions of their municipal law and national policy.
The war policy of the Government, from the beginning of the. rebellion to its close, was to cut off the insurrectionary districts from commercial intercourse with each other and with all the world. The purpose which I ascribe to the claimant in. the purchase of this cotton was twofold: to bring in supplies and carry out products against the public policy of the country, and to collude with revolting citizens, in fraud of our laws, to change the title of property which would otherwise have been subject to confiscation. Trade and traffic in the insurrectionary district necessary for the well-being of society have been upheld, but no transactions treasonable in their nature, or designed in fact or in contemplation of law to prolong the rebellion, have received the aid of our courts. The tests which I apply to the claimant’s transactions are these: If a citizen of the United States, domiciled during the war of the rebellion on loyal territory, say in New York, were to bring an action upon a contract for blockade-running, would a court of the United States give effect to it as a legally meritorious contract? If the responsible leaders of the insurrection had conveyed away their prop *699 erty to evade confiscation, could they resort to our courts to acquire the fruits of such transactions f Manifestly not; and the courts of a country will not aid a foreigner to accomplish that which the laws or policy of the country forbid to its own citizens. In my judgment, the claimant’s title to the property in suit, having been acquired through blockade-running and for the purposes of blockade-running, cannot be upheld in the courts of this country.
I place my decision entirely upon this ground of improperly-acquired title, but there are other questions in the case to which I deem it proper to advert.
On the former decision I was also of the opinion that as the Amended Court of Claims Act (12 Stat. L., 765, § 12) contemplates aid and comfort to rebellion by two classes of persons, viz, those who owe and those who do not owe allegiance to this Government, and closes the court equally to both, it would follow that; the claimant, who in fact rendered aid and comfort, though by means of a traffic lawful at public law, could not prosecute his suit, though guiltless of an offense against our municipal law. It is due to the able arguments of the present trial to say that they have demonstrated, in my maturer judgment, the error of that conclusion. When Congress prescribed in the Abandoned or captured property Act the terms and conditions on which owners of captured property may recover the proceeds thereof, a court, I now think, cannot import other terms and conditions from another statute, though it may refer, as the Supreme Court did in Zellner's Case, (C. Cls. R., 137,) new subjects of jurisdiction to the practice and remedial processes prescribed and granted by the former act. The “aid or comfort” which would form a bar to the claimant’s recovery is the “aid or comfort” defined and intended by the Abandoned or captured property Act; and that “ aid or comfort” the Supreme Court has interpreted in the case of aliens, as of citizens, to be the breach of allegiance constituting an offense of crime.
I am also of the opinion that the case is now in precisely the same plight that it was in when first tried. The defendants have gained no legal point by the new trial. Whether a foreign neutral sold goods contraband or not contraband to a belligerent, his traffic was legal at public law, and his act, aid or comfort to the insurgents as a matter of fact. The sending of cannon through the blockade was no more an offense against our muni *700 cipal law or the public law than the sending of bread; and whatever difference there may be is one of degree, and not of kind. The giving of cannon to the Confederate cause was a mere incident of his commercial transactions; and if a foreign neutral may give to a belligerent things contraband of war for a consideration, it is altogether too refined an exception to say that it would be an offense for him to give them without a consideration. Neither the magnitude of the sale nor the nature of the thing sold nor the motive of the‘giver can make this intercourse a crime.
Nor can I agree that any act which is not an offense against the municipal law of the United States will impose upon the claimant a disability to prosecute his suit in this court for the proceeds of his captured property. Before the decision of the Supreme Court defined- the words “ aid or comfort to the present rebellion” in the Abandoned or captured property Act to import a crime and impose a personal disability to maintain a suit, this court had construed the statute as one enacted midway in the rebellion, prospective in its character and intent, whose controlling purpose was topreventindividuals from aiding the rebellion, and to that end assuring those who should continue .to refrain (and no others) of the restitution of their captured property. Pursuant to this supposed purpose of the statue, it had been held that the title passed by capture and vested absolutely in the United States; that the restitution of the proceeds to the loyal was founded on com'pact and in the nature of a reward for their meritorious conduct, and hence that abstaining from giving aid or comfort was a jurisdictional fact, irrespective of allegiance or felonious intent, and equally conditional upon all suitors, be they citizens or aliens, enemies or neutrals.In accordance with these general principles, it had been held in the cases of deceased owners that the right to recover depended upon the loyalty of him who had owned the property, and not upon that of the administrator or other representative who chanced to bring the suit; and, in the cases of persons who relied upon the pardon of the Executive, that pardon or amnesty, while it might obliterate an offense, could not restore the substantial compact which the party had broken, nor change the operation of a statute so as to relieve a party from making proof of a jurisdictional fact.
By the Supreme Court an utterly different interpretation was given to the statute; which interpretation was reiterated in such *701 varied forms and manifold cases that no plausibility of statement or sophistry of reasoning can warp the meaning or undo the construction. (Klein’s Case, 7 C. Cls. R., 240; Carroll’s Case, ib., 255; Armstrong’s Case, ib., 280; Pargoud’s Case, ib., 289.) This construction, moreover, was intensified by the fact that each decision involved the reversal of a judgment and laid down a rule which authorized other recoveries in then existing suits, and shattered the supposed title of the Government to a fund in which its ultimate proprietary interest would have amounted, as was believed, to more than $20,000,000.
The court (Klein’s Case, 7 C. Cls. R., 240) classified all “property in the insurgent States” and designated the fourth class as of “a peculiar description, known only in the recent war, called captured and abandoned property.” Of this property the court held that the title did not pass by capture. The court, moreover, held that the title could not have been divested by any means except a judgment of confiscation after due legal proceedings. From these premises the court logically drew the deduction that the Government, having had no title or interest of its own in the captured property, was but the trustee of the fund, holding it for the use of those entitled to it by the express terms of the statute and for all others who might at any time be recognized as entitled to it on considerations of public policy; and that the criminal offense of giving aid or comfort was not a matter affecting a compact or going to the jurisdiction, but constituted a personal disability to maintain an action which, because it was criminal, could be removed by the pardon of the Executive.
If it now be conceded that the claimant in this suit became the owner of this cotton by a contract not repugnant to the laws or public policy of the United States, the Government stands before us as a suitor in the singular attitude of a trustee having in its possession a fund (the subject of this suit in equity) in which it has no proprietary interest, and which it holds for the use of a British subject in whom the property is, yet whose right to sue for this property it denies. For such a case it would seem to me paradoxical were I to hold that the United States are trustees for one whose property in their possession has not been divested by capture or confiscation and who has committed no offense against their municipal law, yet who, never th eless, can not pursue th e remedy provided by .statute *702 for a cestui que trust in such cases because of a bar arising from a duplicity of construction that ascribes to the same words of the same statute an intent to make the crime, and not the act, a personal disability for one party, and the act without the crime a personal disability for another. I cannot approve of any such duplicity of construction as would attach the consequences of crime to acts wherein no crime existed. And if it be said that the generality of the terms used in the statute nevertheless includes the exterritorial acts of a foreign neutral, I must say, as Lord Stowell said of an English statute in the case of the Le Louis, (2 Dods. Ad. R., 239,) “ Neither the British act of Parliament, nor any commission founded on it, can affect the rights or interests of foreigners unless they are founded upon principles and impose regulations that are consistent with the law of nations. That is the only law which G-reat Britain can apply to them; and the generality of any terms employed in an act of Parliament must he narrowed in eonstruction by a religious adherence thereto.”

7 C. Cis. R., 240.

 7 C. Cls. R., 192.

 8 C. Cls. R., 153.

 James M. Carlisle, esq., who, long the leader of the Washington bar, died May 19, 1877.